808 So.2d 294 (2001)
SWAT 24 SHREVEPORT BOSSIER, INC.
v.
Robbie BOND.
No. 2000-C-1695.
Supreme Court of Louisiana.
June 29, 2001.
*296 Bryce J. Denny, Cook, Yancey, King & Galloway, Shreveport; Scott Zimmer, Shreveport, Counsel for Applicant.
Tommy K. Cryer, Shreveport, Counsel for Respondent.
KIMBALL, Justice.[*]
We granted a writ of certiorari to resolve a split among the circuit courts of appeal regarding the proper interpretation and application of La. R.S. 23:921, relating to noncompetition agreements. For the reasons that follow, we interpret the limited exception found in § 921(C) to the general nullity of such agreements to apply only to those agreements in which the employee agrees to refrain from carrying on or engaging in his own business similar to that of the employer. Because the language in the noncompetition agreement presented in this case goes beyond this limited exception, it is unenforceable. The judgment of the court of appeal affirming the trial court's refusal to grant an injunction in favor of the former employer is therefore affirmed, and the case is remanded to the trial court for further proceedings.

FACTS AND PROCEDURAL HISTORY
Plaintiff, SWAT 24 Shreveport-Bossier, Inc. (SWAT), is a construction company specializing in insurance restoration work following disasters such as fires, floods, and hail storms. As a licenced contractor, SWAT provides both immediate, twenty-four hour emergency repair, and subsequent restoration of the home to its former condition.
SWAT first employed defendant, Robbie Bond, in September 1992, as a carpenter helper. Bond received periodic promotions and, in January 1998, he was promoted to production manager.[1] In connection with this promotion, Bond entered into an Employment Agreement with SWAT that specified the term of the agreement and Bond's duties, compensation, and benefits. Additionally, the Agreement contained a "Non-Competition" clause that provided:
In exchange for giving him confidential and proprietary information or trade secrets to be used in his employment, Employee covenants and agrees that during his employment and for a period of two (2) years following the termination of his employment for whatever reason, he will not, within the parishes of Caddo, Bossier, Webster, Claiborne, Lincoln, Union, Jackson, Ouachita, Desoto, Red River, *297 Sabine, Bienville, Winn, Caldwell parishes of Louisiana and the municipalities of Shreveport-Bossier, Coushatta, Monroe, Louisiana and East Texas and Southern Arkansas:
a. Directly or indirectly, engage in competition with SWAT 24 Shreveport[-]Bossier, Inc., or serve as an officer, employee, director, agent or consultant of any business, which is in direct or indirect competition with SWAT 24 Shreveport-Bossier, Inc.
b. [R]equest or cause any employee of SWAT 24 Shreveport-Bossier, Inc., to terminate his or her employment with SWAT 24 Shreveport-Bossier, Inc., (unless such actions are within the Employee's authority as SWAT 24 Shreveport-Bossier, Inc.); or
c. Offer to employ, employ, or enter any business relationship with any employees employed by [SWAT 24] during Employee's employment.
The Agreement was signed by Bond, William J. Cowley, former Chief Operating Officer of SWAT, and a notary.
On June 19, 1998, Bond wrote a letter to SWAT stating that he resigned his employment with SWAT effective that day. SWAT subsequently discovered that Bond went to work for National Restoration Services (NRS), another construction company working in the same area. On August 14, 1998, SWAT filed a petition for damages and preliminary and permanent injunctive relief, alleging that Bond violated the terms of the Agreement's noncompetition clause. Bond filed a reconventional demand, which included claims for unpaid wages, overtime hours, bonuses and equipment costs.
On March 18, 1999, the trial court held a hearing on SWAT's request for injunctive relief. The parties stipulated to the admission of the Agreement, Bond's deposition, and Bond's resignation letter to SWAT. In addition to these stipulations, the trial court heard testimony from Cowley and Bond regarding the nature of SWAT's business and Bond's position with SWAT. The trial court subsequently denied SWAT's request for injunctive relief.[2] The trial court found that Bond worked as a production manager at both SWAT and NRS. The trial court began its analysis by noting that La. R.S. 23:921 generally prohibits noncompetition agreements except in limited circumstances as provided for in the statute. The court then, relying on the case of Summit Institute for Pulmonary Medicine & Rehabilitation, Inc. v. Prouty, 29,829 (La.App. 2 Cir. 4/9/97), 691 So.2d 1384, found that the language of the Agreement's noncompetition clause went beyond the limited exception provided by La. R.S. 23:921(C) in that it prohibits the employee's employment in any capacity with other employers in the field. The court concluded that because the noncompetition provision in the Agreement prohibited Bond from becoming an employee of a competitor, that provision was null and void.
The court of appeal affirmed the judgment of the trial court. 33-328 (La.App. 2 Cir. 5/10/00), 759 So.2d 1047. The court of appeal, also relying on its previous decision in Summit, held that the language of the noncompetition clause went beyond the limited exception provided by La. R.S. 23:921(C), because it prevented the defendant's employment in any capacity with other employers in the same field. The court recognized that this conclusion was *298 in conflict with those of other circuits considering similar issues; however, it determined that its more narrow interpretation of the statute remained valid. Finally, the court of appeal found that when it deleted the portions of the Agreement that were in conflict with the provisions of the statute, the Agreement was left with no language to prohibit the conduct complained of by SWAT. The court of appeal therefore affirmed the trial court's judgment denying injunctive relief to SWAT.
This court granted certiorari to resolve an apparent split among the circuits of the courts of appeal regarding the proper interpretation of La. R.S. 23:921(C). Swat 24 Shreveport Bossier, Inc. v. Bond, 00-1695 (La.9/29/00), 769 So.2d 1217.

LAW AND DISCUSSION
Louisiana has long had a strong public policy disfavoring noncompetition agreements between employers and employees. Louisiana Smoked Products, Inc. v. Savoie's Sausage & Food Products, 96-1716, p. 11 (La.7/1/97), 696 So.2d 1373, 1379. Thus, the longstanding public policy of Louisiana has been to prohibit or severely restrict such agreements. Id. This public policy is expressed in La. R.S. 23:921(A)(1), which provides:
Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void.
Louisiana's strong public policy restricting these types of agreements is based upon an underlying state desire to prevent an individual from contractually depriving himself of the ability to support himself and consequently becoming a public burden. See McAlpine v. McAlpine, 94-1595, p. 11 (La.9/5/96), 679 So.2d 85, 91. Because such covenants are in derogation of the common right, they must be strictly construed against the party seeking their enforcement. Hirsh v. Miller, 249 La. 489, 187 So.2d 709, 714 (1966); Turner Professional Services, Ltd. v. Broussard, 99-2838, p. 3 (La.App. 1 Cir. 5/12/00), 762 So.2d 184, 185.
The exceptions to this provision are specifically enumerated by the statute and provide for employer/employee relationships, corporation/shareholder relationships, partnership/partner relationships and franchise/franchisee relationships. The statute defines the limited circumstances under which a noncompetition clause may be valid in the context of each of these relationships. The exception at issue in the instant case is provided for by Subsection (C), which reads:
Any person, including a corporation and the individual shareholders of such corporation, who is employed as an agent, servant, or employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, so long as the employer carries on a like business therein, not to exceed a period of two years from termination of employment. An independent contractor, whose work is performed pursuant to a written contract, may enter into an agreement to refrain from carrying on or engaging in a business similar to the business of the person with whom the independent contractor has contracted, on the same basis as if the independent contractor were an employee, for a period not to exceed two years from the date of the last work performed under the written contract.
La. R.S. 23:921(C) (emphasis added).
The issue presented in this case is whether the noncompetition clause found *299 in the Agreement between SWAT and Bond, which provides that for two years following termination of his employment, Bond will not directly or indirectly engage in competition with SWAT or serve as an employee of any business which is in direct or indirect competition with SWAT within specified parishes, fits within the narrow exception to the nullification of contracts restraining anyone from exercising a lawful profession, trade, or business. SWAT argues that the court of appeal's interpretation of the statute, requiring the former employee to be engaging in his own business in order for the exception found in Subsection (C) to apply, is erroneous. SWAT contends the court of appeal's narrow construction creates distinctions that ignore common business practices and thwarts the legislature's purpose in enacting the exceptions to La. R.S. 23:921(A). SWAT concludes that the Agreement clearly and validly prohibits Bond from being employed by another company if both Bond and the company are in competition with SWAT. Bond, on the other hand, asserts that the court of appeal's interpretation of the statute in this case comports with the general disfavor of noncompetition agreements in Louisiana. Bond contends that an application of SWAT's interpretation of the statute would rewrite La. R.S. 23:921(C) and eviscerate the legislative intent to prohibit restraints on a person's exercise of a lawful profession, trade, or business as stated in La. R.S. 23:921(A). Further, Bond argues that the language of La. R.S. 23:921(C) does not permit an agreement that the former employee not accept employment by a competitor since the phrase "carrying on or engaging in" a competing business is entirely different from "accepting employment by one who is carrying on or engaging in" a competing business.
The courts of appeal that have answered questions similar to that presented in this case have reached different conclusions. Specifically, the decisions of the courts of appeal have differed regarding the scope of competitive activity statutorily allowed to be curtailed by noncompetition agreements.
In reaching its decision in the instant case, the second circuit relied on its prior decision in Summit Institute for Pulmonary Medicine & Rehabilitation, Inc. v. Prouty, 29,829 (La.App. 2 Cir. 4/9/97), 691 So.2d 1384. In Summit, defendant was hired by Summit as a respiratory therapist and subsequently accepted a position in the Business Development and Marketing Department, which required him to recruit patients for Summit's long-term acute care and rehabilitation programs from area hospitals that did not provide such services. After approximately two years of employment, defendant signed an employment contract which contained a noncompetition clause that prohibited defendant from becoming an "officer, director, partner or employee of or consultant to or act in any managerial capacity with ... any entity which manages or provides long term acute medical services and/or physical rehabilitation in [certain specified parishes]" for a period of one year following termination of defendant's employment with Summit.
When defendant voluntarily terminated his employment with Summit and took a position in the marketing department of a competing hospital, Summit sought to enforce the terms of the noncompetition agreement. In opposition to Summit's action for injunctive relief, defendant argued the clause was overly broad under La. R.S. 23:921(C). The trial court granted a preliminary injunction, recognizing the validity and enforceability of the contract. The second circuit reversed, interpreting the exception provided for by Subsection (C) "to allow the employer to prevent a former *300 employee from engaging in a similar business for himself, i.e. an entire business venture, or from being employed in a competitor's business in a position wherein he solicits the customers of his former employer." Id. at p. 6, 691 So.2d at 1387. In reaching this decision, the second circuit reasoned:
While it may be reasonable to prevent an employee from forming a business for himself competing directly against his former employer in the first two years after the employee's termination, it is not reasonable to prevent him from accepting employment with an already existing competitor where his new position involves no solicitation of the customers of the former employer. Such interpretation would unreasonably prevent an employee ... from employment in the medical field as a computer programmer, respiratory therapist or a maintenance person even though such positions might have no impact on the former employer's ability to compete with the new employer.
Id. at pp. 6-7, 691 So.2d at 1387-88 (footnote omitted). The court therefore concluded that because the noncompetition agreement prevented defendant's employment in any capacity with other employers in the medical community, its language was broader than the limited exception allowed by La. R.S. 23:921(C) and was therefore a nullity.[3]
The fourth circuit refused to follow Summit in Scariano Bros., Inc. v. Sullivan, 98-1514 (La.App. 4 Cir. 9/16/98), 719 So.2d 131. There, defendant entered into an employment agreement that contained a noncompetition clause with his employer, Scariano Brothers, Inc., a business engaged in the marketing, distributing and processing of meat, poultry, and meat-related products. The noncompetition clause provided in pertinent part that for two years after termination of defendant's employment, defendant would not, as an owner, principal, agent, partner, officer, employee, independent contractor, consultant, consultant, stockholder, licensor or otherwise, "carry on, be engaged or take part in the Company's Business or in a business similar thereto within the Company's Business area."
Defendant subsequently resigned from Scariano and went to work for one of its competitors. Scariano filed suit seeking to enforce the noncompetition clause contained in the employment agreement. The trial court issued the injunction requested by Scariano, and the fourth circuit affirmed, upholding the validity of the agreement. In explicitly declining to follow Summit, the fourth circuit stated: "It just seems illogical and nonsensical to say that the statutory language only prohibits an employee from conducting his/her own business in competition with a former employer." Id. at p. 6, 719 So.2d at 134.[4] The court found that such an interpretation ignores economic reality and that if the legislature had intended such a strict meaning, it could have so stated. The court held that "`carrying on or engaging in a business similar to that of the employer' can be prohibited by agreement regardless of whether it is the employee's own business or whether the employee *301 works for another." Id. at p. 7, 719 So.2d at 135.[5]
In Moreno & Assocs. v. Black, 99-46 (La.App. 3 Cir. 5/5/99), 741 So.2d 91, the third circuit followed Scariano, thereby refusing to follow the second circuit's decision in Summit. In Moreno, defendant was hired as a safety consultant. During his relationship with Moreno, he signed a noncompetition agreement which provided that, for a period of two years following termination of employment, defendant could not:
directly or indirectly own, manage, operate, control, be employed by, participate in (whether as a proprietor, partner, stockholder, director, officer, Employee, agent consultant, joint venturer, investor, or other participant), or be connected in any manner with the ownership, management, operation, or control of any Person or business in direct or indirect competition with the business conducted by EMPLOYER at time of such termination....
Id. at p. 5, 741 So.2d at 93-94.
Defendant subsequently resigned from Moreno and began working as an independent contractor for one of Moreno's competitors as a safety consultant. Moreno sued to enforce the agreement, and the trial court denied its request for a preliminary injunction, finding that the agreement was against public policy. In reversing the trial court's judgment, the third circuit relied on the decision rendered in Scariano and held that the agreement was not overly broad since it restricts an employee's participation only with a "person or business in direct or indirect competition" with the former employer. Id. at p. 7, 741 So.2d at 95-96. The court concluded that the language of the agreement "cannot act to limit [defendant] from working in any capacity with a competitor; however, it can properly operate to prohibit those actions which directly or indirectly compete with the former employer's business." Id. at p. 7-8, 741 So.2d at 95.[6] *302 Thus, the third circuit found the clause to be enforceable against defendant.
In resolving the split among the decisions rendered by the courts of appeal as discussed above, we must, in ascertaining the scope of La. R.S. 23:921, keep certain principles of judicial interpretation of statutes in mind. These rules of statutory construction are designed to ascertain and enforce the intent of the legislature in enacting the statute. Stogner v. Stogner, 98-3044, p. 5 (La.7/7/99), 739 So.2d 762, 766; State v. Piazza, 596 So.2d 817, 819 (La.1992). The fundamental question in all cases of statutory construction is legislative intent and the reasons that prompted the legislature to enact the law. Succession of Boyter, 99-0761, p. 9 (La.1/7/00), 756 So.2d 1122, 1128. When a law is clear and unambiguous and its application does not lead to absurd consequences, it shall be applied as written, with no further interpretation made in search of the legislative intent. La. C.C. art. 9; La. R.S. 1:4. However, when a law is susceptible of different meanings, "it must be interpreted as having the meaning that best conforms to the purpose of the law." La. C.C. art. 10.
The meaning and intent of a law is determined by considering the law in its entirety and all other laws concerning the same subject matter and construing the provision in a manner that is consistent with the express terms of the statute and with the obvious intent of the lawmaker in enacting it. Boyter, 99-0761 at 9, 756 So.2d at 1129; Stogner, 98-3044 at p. 5, 739 So.2d at 766. The statute must therefore be applied and interpreted in a manner that is logical and consistent with the presumed fair purpose and intention the legislature had in enacting it. Boyter, 99-0761 at 9, 756 So.2d at 1129. Courts should give effect to all parts of a statute and should not adopt a statutory construction that makes any part superfluous or meaningless, if that result can be avoided. Langlois v. East Baton Rouge Parish Sch. Bd., 99-2007, p. 5 (La.5/16/00), 761 So.2d 504, 507; Boyter, 99-0761 at 9, 756 So.2d at 1129. Furthermore, "the object of the court in construing a statute is to ascertain the legislative intent and, where a literal interpretation would produce absurd consequences, the letter must give way to the spirit of the law and the statute construed so as to produce a reasonable result." First Nat'l Bank of Boston v. Beckwith Mach. Co., 94-2065, p. 8 (La.2/20/95), 650 So.2d 1148, 1153 (quoting Smith v. Flournoy, 238 La. 432, 115 So.2d 809, 814 (1959)).
The starting point for the interpretation of any statute is the language of the statute itself. Cat's Meow, Inc. v. City of New Orleans, 98-0601, p. 15 (La.10/20/98), 720 So.2d 1186, 1198; Touchard v. Williams, 617 So.2d 885 (La.1993). The language of La. R.S. 23:921 at issue provides that every contract by which anyone is restrained from exercising a lawful profession, trade or business of any kind shall be null and void except that any person who is employed as an employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer within a specified parish so long as the employer carries on a like business therein, not to exceed a period of two years from termination of employment. In the instant case, the controversy revolves around the phrase "carrying on or engaging in a business similar to that of the employer." We find the *303 statutory language at issue is susceptible of more than one meaning.[7] It could mean, as Bond argues and the second circuit agrees, that an employee is permitted to contract away only his right to pursue his own competing business. On the other hand, the language could mean, as SWAT contends and the third and fourth circuits would likely agree, that an employee is permitted to contract away his right to work in a competing business as the employee of another. As the language at issue is susceptible of more than one meaning, we must apply and interpret it in a manner that is logical and consistent with the presumed fair purpose and intention the legislature had in enacting it. We will therefore begin with a review of the legal background surrounding La. R.S. 23:921 as we search for the legislature's purpose and intent in enacting the statute.
Prior to the enactment of the first statutory prohibition of noncompetition agreements in 1934, Louisiana courts consistently held these agreements to be unenforceable. Orkin Exterminating Co. v. Foti, 302 So.2d 593, 596 (La.1974) (citing Cloverland Dairy Products Co. v. Grace, 180 La. 694, 157 So. 393 (1934) and Blanchard v. Haber, 166 La. 1014, 118 So. 117 (1928)). By Act No. 133 of 1934, the legislature enacted the state's first statute governing noncompetition agreements, explicitly providing that the public policy of the state to be "that employers shall not require or direct their employees... to enter into any contract ... whereby and whereunder the employee agrees and contracts not to engage in any competing business for themselves or as the employee of another upon the termination of their contract with such employer," and declaring any contract containing such provisions to be null and void as to those provisions. One reason for the enactment of Act 133 was public policy forbidding the exclusion of individuals from the fields of work for which they were perhaps best suited. Louisiana Smoked Products, 96-1716 at 5, 696 So.2d at 1376.
In 1962, the legislature amended Act 133 to allow employers and employees to "enter into voluntary contracts and agreements" under certain conditions. The statute was amended to provide:
No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two (2) years.
La. R.S. 23:921 (1962) (emphasis added). Unlike the language of the version of La. R.S. 23:921(C) at issue in this case, the language of this amendment clearly provided that an employer could not require any employee to enter into any contract *304 restricting the employee from engaging in any competing business for himself or as the employee of another unless the employer incurred certain training or advertising expenses. The purpose of this amendment was "to protect an employer only where he has invested substantial sums in special training of the employee or in advertising the employee's connection with his business." Orkin Exterminating Co., 302 So.2d at 597.
In 1989, the statute was redrafted to eliminate the requirement that an employer expend substantial sums in training or advertising in order to enter into a valid noncompetition agreement with an employee. Instead of the older, somewhat subjective yardstick by which to determine whether an agreement not to compete was valid, the legislature changed the statute to include more objective measures of an agreement's validity. The new statute used language similar to that found in today's version of La. R.S. 23:921 (A) and (C):
A. Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade or business or any kind, except as provided in this Section shall be null and void.
* * * *
C. A person who is employed as an agent, servant, or employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, so long as the employer carries on a like business therein, not to exceed a period of two years.
La. R.S. 23:921 (1989) (emphasis added).[8] The Minutes of both the Senate and House Committees that considered the bill to reenact La. R.S. 23:921(1962) shed little light on the issue facing us today. Mr. Fitzmorris testified to both Committees that the bill would strengthen the state's economic base, and an attorney, asked by a Representative in the Civil Law and Procedure Committee what effect the bill would have, stated that it "allows for a voluntary agreement between employers and employees to restrict nonsolicitation." Minutes of the Committee on Labor and Industrial Relations, La. Senate, 1989 Reg. Sess., June 7, 1989; Minutes of the Civil Law and Procedure Committee, La. House of Representatives, 1989 Reg. Sess., May 23, 1989.[9] Significantly, however, the language *305 limiting the employer's right to require an employee to agree not to "engage in any competing business for himself, or as the employee of another" used in the 1962 version of the statute was changed in the 1989 version.
Although there is little in the preserved legislative history of the 1989 amendment rewriting La. R.S. 23:921 to allow us to pinpoint the collective reasoning behind the legislature's reenactment of the statute with absolute certainty, the information we do have evidences an evolving standard by which the validity of an agreement not to compete may be recognized. Each version of the statute clearly establishes that the public policy of this state disfavors noncompetition agreements. In fact, the current version of the Subsection (A), originating with the redrafting of the statute in 1989, contains the strongest pronouncement of this policy: "Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void" (emphasis added). Although recent amendments to the statute have broadened the classes of persons who may fall within an exception to the nullity of noncompetition agreements, the language of the original exceptions themselves has not been expanded, thus solidifying the notion that the public policy disfavoring such agreements remains strong.
The 1989 amendment contained a significant change in the language relating to the type of business in which an employee may be allowed to agree not to compete. Instead of specifying that an employee may be allowed to agree not to engage in any competing business for himself, or as the employee of another, the 1989 amendment limited a valid noncompetition agreement to one in which the employee agreed to refrain from "carrying on or engaging in a business similar" to that of the former employer or from soliciting customers of the employer subject to certain other restrictions. This change in the language is significant because "[w]here a new statute is worded differently from the preceding statute, the legislature is presumed to have intended to change the law." Brown v. Texas-La Cartage, Inc., 98-1063, p. 7 (La.12/1/98), 721 So.2d 885, 889 (citing New Orleans *306 Rosenbush Claims Service, Inc. v. City of New Orleans, 94-2223, p. 12 (La.4/10/95), 653 So.2d 538, 544). Thus, the new language, "carrying on or engaging in a business similar," is presumed have a different meaning than "engage in any competing business for himself, or as the employee of another." The new language clearly cannot broaden the previous phrase because the prior language covered any employment in which the employee might engage, i.e., the employee works either for himself or for another. In light of this fact, we interpret the legislative intent in making this change in the language to limit further the type of business in which an employee may agree not to compete with his former employer. As evidenced by the language used in the 1962 version of the statute, the legislature clearly recognized a distinction between engaging in business for oneself and engaging in business as the employee of another and chose not to make this distinction in the current version of the statute. The presumption arising from the legislature's deliberate change in the language, combined with the principle that we must strictly construe the exceptions to the longstanding public policy of this state disfavoring agreements not to compete, lead us to believe that the legislature intended that a noncompetition agreement restraining an employee from carrying on or engaging in his own business may be valid provided certain conditions are met. Conversely, an agreement that restrains an employee from carrying on or engaging in a competing business as the employee of another does not fall within the exception provided for by La. R.S. 23:921 (C) and, instead, would be null and void pursuant to Subsection (A).
This interpretation is buttressed by the inclusion in the language of La. R.S. 23:921(C) that an employee may not only agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer, but also may agree to refrain from "soliciting customers of the employer" subject to certain restrictions.[10] If we were to interpret the phrase "carrying on or engaging in a business similar" to mean "carrying on or engaging in a competing business as an employee of another," then the portion of the statute dealing with the solicitation of customers of the employer would be rendered meaningless. See Alliance for Affordable Energy v. Council of City of New Orleans, 96-0700, p. 13 (La.7/2/96), 677 So.2d 424, 431 ("When a law is susceptible of two or more interpretations, that which affords a reasonable and practical effect to the entire act ... is to be preferred over one which renders part thereof ridiculous or nugatory."). The portion of the exception allowing an employee to agree to refrain from soliciting the employer's customers would be meaningless if we interpreted the beginning of the sentence to allow an employee to agree not to work as the employee of a competing business since there would be no business for which to solicit customers. That is, if the employee signs a valid employment agreement prohibiting him from carrying on or engaging in either his own competing business or that of another, then he would have no reason to solicit customers attempting to lure them away from his former employer. Furthermore, as noted by the second circuit in Summit, it is simply not reasonable to prevent an employee from accepting employment *307 with a pre-existing competitor when the employee's new position involves no solicitation of the former employer's customers. Summit, 29,829 at p. 6-7, 691 So.2d at 1387-88.
If, on the other hand, we interpret the phrase "carrying on or engaging in a business similar" to mean that the employee may agree to refrain from carrying on or engaging in his own business, as we do, then all parts of the statute are given meaning. Thus, an employee whose noncompetition agreement comports with the requirements of La. R.S. 23:921(C) may be validly restricted from carrying on or engaging in his own competing business and from soliciting customers of the employer for his own competing business or the competing business of another.
Finally, our conclusion that "carrying on or engaging in a business similar" should be interpreted to mean "carrying on or engaging in the employee's own business similar" to that of the employer is supported by the overbroad and absurd results that would result if SWAT's interpretation was adopted. If the statute were to allow an employer to enter into an agreement whereby an employee agrees to refrain from being employed by a competitor subject to certain geographical restrictions, then, for example, a doctor employed by a regional hospital who signs such an agreement could not practice medicine in any capacity in the region for two years. The same situation would result if a riverboat pilot, a plumber, or a bank manager signed a noncompetition agreement. Such results would curtail employees' ability to earn a living and offend the basic premise of Louisiana's doctrine of employment at will. These overbroad and expansive results could not have been intended by the legislature.
For all the above reasons, we conclude that La. R.S. 23:921(C) permits an employee to agree with his employer to refrain from carrying on or engaging in his own competing business and/or from soliciting customers of the employer subject to certain geographical and time limitations. The issue next becomes whether the Non-Competition clause in Bond's Agreement comports with the limited exception provided for by La. R.S. 23:921(C) or whether its provisions are broader than those allowed by the statute.
A noncompetition agreement is a contract between the parties and should be construed according to the general rules of interpretation of contracts provided in Articles 2045-2057 of the Civil Code. The interpretation of a contract is the determination of the common intent of the parties with courts giving the contractual words their generally prevailing meaning. La. C.C. arts. 2045, 2047; see e.g.Amend v. McCabe, 95-0316, p. 7-8 (La.12/1/95), 664 So.2d 1183, 1187. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the intent of the parties. La. C.C. art. 2046.
The provisions of the Agreement at issue provide that in exchange for giving Bond confidential and proprietary information or trade secrets, Bond agrees that for two years following the termination of his employment and subject to certain geographical restrictions, he will not directly or indirectly engage in competition with SWAT or serve as an employee of any business which is in direct or indirect competition with SWAT. Bond argues the scope of the prohibition set forth in the Agreement exceeds the exception provided by La. R.S. 23:921(C) in that it seeks to prohibit his employment in any capacity with a competitor.[11] We agree that the *308 Agreement's language at issue goes beyond that which is allowed by the statute.
The Agreement specifies that Bond was prohibited from directly or indirectly engaging in competition with SWAT in specified parishes for a period of two years. If this provision is construed arguendo to prohibit Bond only from engaging in competition with SWAT by forming his own competing business, it would fit within the exception provided for in La. R.S. 23:921(C) as discussed above. Conversely, if this provision is construed to prohibit Bond from accepting employment by one of SWAT's competitors, then it is overbroad and unenforceable. Construction of this restriction as anything other than prohibiting Bond from competing with SWAT by engaging in his own business will not be allowed. Bond did not, however, form his own business to compete with SWAT. Rather, he accepted an employment position with NRS, SWAT's competitor. Thus, the applicable provision in the Agreement becomes that which unambiguously prohibits Bond from serving as an employee in any business which is in direct or indirect competition with SWAT. The language of this provision goes beyond the limited exception of § 921(C) by preventing Bond's employment in specified parishes in any capacity with any other business in direct or indirect competition with SWAT. It is therefore unenforceable.
The fact that Bond was employed by NRS in the same position he held at SWAT does not change the analysis.[12] The statute does not allow a flat prohibition of employment by a competitor, even if the employee's new job duties are exactly the same as those performed for the former employer. The contractual language, prohibiting Bond from accepting employment by a competitor of SWAT, is simply overbroad and therefore null and void.
The issue then becomes whether the noncompetition agreement should be declared null and void in its entirety or whether the offending language should be declared null and excised from the remainder of the agreement. This issue was addressed in AMCOM of Louisiana, Inc. v. Battson, 28,171 (La.App. 2 Cir. 1/5/96), 666 So.2d 1227, a case which involved a geographically overbroad noncompetition agreement. The contract at issue specified that the employee would not compete with his former employer "in Shreveport or Bossier City, Louisiana, or in Caddo or Bossier Parishes, Louisiana, or within a seventy-five (75) mile radius of Shreveport or Bossier City, Louisiana." The contract also contained a severability clause. The employee argued these restrictions were overly broad because they failed to specify the "parish or parishes, municipality or municipalities, or parts thereof" wherein the employer carries on a like business as required by La. R.S. 23:921. The trial court agreed, striking the language regarding the seventy-five mile radius, but enforcing the restriction in Shreveport and Bossier City and Caddo and Bossier Parishes. *309 On appeal, the second circuit agreed the language was overbroad, but refused to enforce any portion of the agreement, declining to "rewrite" the overly broad language. This court granted the employer's writ and ordered the reversal of the judgment of the court of appeal and the reinstatement of the trial court's judgment. 96-0319 (La.3/29/96), 670 So.2d 1223. As pointed out by the judge dissenting from the second circuit's opinion, the severability clause did not require a court to reform, redraft, or create a new agreement. It required only that the offending portion of the agreement be severed.
Like the contract in AMCOM, the Agreement at issue contains a severability clause which provides:
In the event of any of [sic] provisions, paragraphs or portions thereof of this Agreement are held to be unenforceable and invalid by any court of competent jurisdiction, the validity and enforceability of the remaining provisions or portions thereof shall not be affected thereby, and each term and provision of the agreement shall be valid and enforceable to the fullest extent permitted by law.
The language of the Agreement makes it possible to excise the offending language from the noncompetition clause without doing undue damage to the remainder of the provision. In light of this severability clause which reflects the parties' intent and in accordance with this court's decision in AMCOM, we, like the court of appeal below, will sever the null clause from the Agreement. Without the offending portion of the statute, there is nothing in the language of the Agreement that will be construed to prohibit the conduct of which SWAT complains.[13] We therefore find the trial court correctly denied SWAT's request for an injunction in this case.
We are especially inclined to sever the offending portions of the Agreement without declaring it a nullity in its entirety considering the state of uncertainty in the law over this issue which was created by the split in the circuits concerning the proper interpretation to be given § 921(C). We find this result does not contravene Subsection (A) of the statute since at least part of the noncompetition agreement arguably may fit within the exception provided for in Subsection (C).[14]
We must address one remaining issue raised by Bond. Bond alleged in this court that this case was rendered moot when the term of the noncompetition agreement elapsed on June 19, 2000, two years from the date his employment relationship with SWAT was terminated. A moot issue is one that has been deprived of practical significance, made abstract or purely academic, and has no subject matter upon which the judgment of the court can operate. Perschall v. State, 96-0322 (La.7/1/97), 697 So.2d 240, 253. We find that because SWAT requested damages for breach of the Agreement, we were not presented with a moot issue in this case. Had this court concluded that the trial court should not have denied SWAT's request for injunctive relief, then we could *310 have remanded the case for a determination of damages owed to SWAT, if any. In any case, Bond conceded after oral argument in a letter to the court that the damages claim remained viable based upon SWAT's alternative prayer for damages in its petition.

DECREE
For the foregoing reasons, we conclude the language of La. R.S. 23:921(C) allows an employee to agree to refrain from carrying on or engaging in the employee's own business similar to that of the employer, subject to certain geographical and time limitations. Because the language of the Agreement at issue went beyond that permitted by the narrow exception of La. R.S. 23:921(C), we declare those offending portions null and void and sever them. The remaining portions of the Agreement cannot be construed to prohibit the actions the employee has taken subsequent to the termination of this employment with his former employer. The judgment of the court of appeal is therefore affirmed, and the case is remanded to the trial court for consideration of Bond's reconventional demands not yet considered.
AFFIRMED AND REMANDED.
TRAYLOR, J., dissents and assigns reasons.
KNOLL, J., dissents for reasons assigned by TRAYLOR, J.
GULOTTA, J., dissents for reasons assigned by TRAYLOR, J.
TRAYLOR, J., dissenting
While acknowledging that the rules of statutory construction require a search for legislative intent, the majority of the court continues to do what initially prompted the legislature to amend the statute in the first place: the court continues to construe the statute so narrowly that effectively no competitive agreements can be enforced, and completely ignores the competitive realities of today's commercial world in fear of some factual scenario that is not before this court.
The exception provided in La.Rev.Stat. § 23:921(C) states:
Any ... employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, so long as the employer carries on a like business therein, not to exceed a period of two years from termination of employment. [Emphasis added].
Although the majority correctly concludes that the phrase "carrying on or engaging in a business similar to that of the employer" is susceptible to different meanings, the court fails to conduct an accurate review of the legal background surrounding La.Rev.Stat. § 23:921 to discern the legislature's intent.

Legislative history
Despite the general rule that public policy disfavors noncompetition agreements, the prohibition against noncompetition agreements is a far cry from absolute. Beginning with the amendments in 1962, the legislature has continued to add exceptions to the general rule against noncompetition agreements. Those exceptions must be construed strictly to comport with the overall prohibition in La.Rev.Stat. § 23:921(A), and public policy concerns against restricting someone's livelihood; at the same time, the exceptions must be given effect within the words of their generally prevailing meaning and honor the legislature's intent in passing the laws.
*311 In 1962, the legislature redrafted the statute to provide for employers and employees to "under certain conditions enter into voluntary contracts and agreements." H.B. 788, 1962 Reg. Sess. (La.1962). The statute was amended to provide:
No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years." [Emphasis added].
LA.REV.STAT. § 23:921 (1962).
The statute remained unchanged until 1989, when a wholesale revision was submitted by Representatives Dastugue and Jenkins, with continued adjustments in 1990 and 1991. The legislature completely redrafted the noncompetition statute in an effort to remedy the flaws emanating from the courts' restrictive interpretation of the 1962 amendment, and to restore the legislature's original intent to the statute. See Minutes of the Committee on Labor and Industrial Relations, La. House of Rep., 16th Leg., 1990 Reg. Sess. (June 1, 1990) (statement of Representative Jenkins) (commenting on the unfortunate situation regarding the courts' reluctance to enforce noncompetition agreements, despite the statutory exceptions).[1] The bill added the exceptions for noncompetition agreements between buyers and sellers in the sale of a business, between partners in dissolution, and between employers and employees. H.B. 1378, 1989 Reg. Sess. (La.1989). Amendments to add a time limit of two years, and expand the geographical limitations were added by suggestion of the Civil Law and Procedure Committee. Minutes of the Committee on Civil Law and Procedure, La. House of Rep., 15th Leg., 1989 Reg. Sess. (May 23, 1989).
In response to suggestions by various business groups, the legislature amended the statute again in 1990, adding corporations and shareholders to the definition of "any person" under the statute, S.B. 196, 1990 Reg. Sess. (La.1990); and adding an exception to cover computer programmers who work in the software industry, House Bill 1180, 1990 Regular session (La.1990); in 1991, adding exceptions for franchisors and franchisees, H.B. 1672, 1991 Reg. Sess. (La.1991); in 1995, expanding agreements to cover independent contractors, S.B. 1373, 1995 Reg. Sess. (La.1995); and *312 in 1999, to provide for validity of choice of law and forum clauses, S.B. 915, 1999 Reg. Sess. (La.1999). In the 1991 amendment adding the provisions for franchisor/franchisee agreements, the original bill was amended to add "engaging in any other business similar to the subject of the franchise" in addition to the prohibition against competing with the franchisor.
Although the La.Rev.Stat. § 23:921 exceptions should be narrowly construed, the majority's interpretation strangles the statute, and effectively renders noncompetition agreements effectively meaningless between an employer and his employee. The rules of statutory construction require that the general intent and purpose of the legislature in enacting the law must, if possible, be given effect. Radiofone, Inc. v. City of New Orleans, 93-0962 (La.1/14/94), 630 So.2d 694; Backhus v. Transit Cas. Co., 549 So.2d 283 (La.1989); Truscon Steel Co. v. B. & T. Const. Co., 170 La. 1083, 129 So. 644 (1930). The statute must therefore be applied and interpreted in a manner which is consistent with logic and the presumed fair purpose and intention of the legislature in passing it. See First Nat'l Bank of Boston v. Beckwith Mach. Co., 94-2065 (La.2/20/95), 650 So.2d 1148; Rodriguez v. Louisiana Med. Mut. Ins. Co., 618 So.2d 390 (La. 1993).
In contravention of the intent of the legislature, the majority's interpretation of the statute that limits roles with a new employer to only those that involve solicitation of the former employer's customers is overly restrictive for several reasons. First, the dictionary definitions of "carry on" and "engage," as they relate to employment, are not limited to activities of an individual who founds or starts his or her own enterprise. The majority in this case interpreted the terms "carrying on" and "engaging" to cover only those instances when an employee leaves the employer and starts a business similar to the former employer's business. For the phrase "carry on," this interpretation is arguably supported by the dictionary definition of "conduct, manage (carry on a new enterprise)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 344 (4th ed. 1976). However, "engage" is defined in multiple ways, including:
 to involve or entangle (as a person) in some enterprise
 to provide occupation for (as a person, his interest, or labor)
 to arrange to obtain the services of, usually for a wage or fee
 to enter oneself into an agreement to serve (example: he engaged himself with the company for two years)
Id. at 751. Rather, a plain language interpretation of the term "engage" supports the opposite finding, namely that individual is engaged in the employ of another.
The majority reasons that the phrase "and/or from soliciting customers of the employer" would be rendered meaningless by an interpretation of the statute that allowed employers to prevent their former employees from working for another employer in any capacity. However, this conclusion erroneously presumes that the only means an employer uses to solicit customers is through its employees. The employer who pays a referral fee, or hires an independent contractor to solicit customers, could prevent a former employee from working to solicit customers though those means to aid a competitor. Most notably, the phrase that involves the prohibition against solicitation of customers lacks the modifier "in a business similar to the employer."
Second, the prior 1962 statute used the language "engage in any competing business for himself, or as the employee of another,...." Considering the legislative *313 intent surrounding the 1989 amendment, it does not follow that, in creating the exception in La.Rev.Stat. § 23:921(C), the legislature intended to further limit employees who compete with former employers to only those who solicit the former employer's customers. Instead, the legislature used broader language in "carry on or engage" and "and/or solicit" and "in a business similar to." Considering the legislative history, a more plausible reading of the statute suggests that the legislature only intended to replace the restrictive "substantial expenses" test, superimposed by this Court in Foti, with objective geographical and time limitations.
Public policy supports free competition in the market to encourage businesses to compete not only in what they sell in goods or services, but also in the raw materials, equipment, facilities, and skills and labor in the open market. However, the legislature has determined that competitors can restrict that competition, in a limited area and for a limited time, under La.Rev.Stat. § 23:921(C). The legislative intent evidenced by the legislature's repeated amendments to broaden the statutory exceptions, and comments by its members on the overly restrictive interpretations given by the courts, support a rejection of the majority's interpretation as overly restrictive in contravention to the legislature's will.
Third, a company can be negatively impacted by an employee who moves to a competitor in roles beyond that of direct solicitation with customers. An employer can be motivated to enforce a non-competition agreement to prevent the loss of significant training and resources spent on the employee, to preserve an employee's specialized skill, or prevent a competitor gaining advantage from a employee's exposure to the former employer's more efficient system of operation. See Tracy L. Staidl, The Enforceability of Noncompetition Agreements When Employment Is At-will: Reformulating the Analysis, 2 Empl. Rts. & Employ. Pol'y J. 95 (1998) (discussing the change in the American marketplace "from one primarily focused on mechanized industry to one emphasizing highly-technological and service-oriented industries" which has precipitated the accelerated use of post-employment noncompetition agreements, viewed as the best method for protecting valuable confidential information, such as technological advances and customer lists of the employer, from exploitation by former employees with competitors in the new market); Micheal L. Agee, Comment, Covenants Not to Compete in Tennessee Employment Contracts: Almost Everything You Wanted to Know but Were Afraid to Ask, 55 Tenn. L.Rev. 341 (Winter 1988) (reviewing the history of restraints against trade in general, starting with early English common law, as a reflection of prevailing political and economic ideas under the guild system, which would deprive the public of a skilled worker at a time when workers were scarce; as political and moral ideas have evolved, freedom of contract has developed which recognized that "interests of the contracting parties are not necessarily the same as the interests of the Commonwealth").
Without such protection, employers can not afford to invest optimally in product development or in their employees. In addition, the covenants promote freedom of communication within a company, a conduit for optimal efficiency. See Harlan M. Blake, Employee Agreements Not to Compete, 73 Harv. L.Rev. 625, 627 (1960); see also Stewart E. Sterk, Restraints on Alienation of Human Capital, 79 Va. L.Rev. 383, 386-87 (1993) (discussing how "[d]octrinal limitations on enforceability of assignments of human capital threaten to *314 discourage employer investment in employees").
With its decision, the majority continues to preserve the outgrown concepts espoused in Foti regarding an individual's right of freedom and opportunity to better themselves, and the perceived disparity in bargaining power between the employer and employee. Foti, 302 So.2d at 596. As in the Foti decision, the majority's decision today renders the exceptions in the 1989 amendment practically meaningless. The majority's interpretation of the statute creates narrow distinctions that ignore common business practices and thwarts the legislature's purpose in enacting the exceptions under La.Rev.Stat. § 23:921.
Rather, like the 3rd and 4th circuits considering the issue, a proper reading of La.Rev.Stat. § 23:921(C) applies to the situation in which an employee competes with his former employer as the employee of a competitor for two reasons. First, if the legislature had intended the strict interpretation given by the second circuit in Summit, the statute could easily have said "engaging or carrying on his own business." Scariano Bros., 719 So.2d at 134. Second, the economic reality of the market place more often than not involves employee movement working for an employer in the same job. Id.
As revealed by a cursory review of cases in our lower courts, each situation requires a fact-intensive analysis of the parties involved, the agreement's provisions, and the competitive behavior sought to be enjoined. In reality, the commercial world often reflects that the employee has the upper hand, in possessing a specialized skill or access to knowledge, which may be gleaned from that same employer. The employer is motivated to procure the employee's agreement not to compete to preserve that competitive advantage, and in exchange, provides additional compensation, bonuses, and other privileges to the employee. See Scariano Bros., 719 So.2d at 133 (offering the defendant a promotion to sales manager, a signing bonus, and an increased salary in an effort to prevent the defendant's departure to a competitor); Dixie Parking, 691 So.2d at 1318 (admitting that she [employee] signed the noncompete agreement in order to gain access to confidential information and obtain substantial bonuses, which she in fact did before leaving to work for a competitor). In this case, Bond received a promotion, an increased salary, a bonus plan, and other privileges in signing the agreement that contained the noncompete clause.
Despite these incentives, the majority adopts a paternalistic approach to protect what it perceives to be the downtrodden employee.[2] A better approach to achieve the legislative intent while preserving a balance between employers and employees in the commercial marketplace would consider the words of the contract, whether the employers are competitors, and the employee's position and its impact on the former employer.

Interpretation of Contractual language in light of La.Rev.Stat. 23:921
A noncompetition agreement is a contract between the parties and should be construed using general rules of construction of contracts provided in the Louisiana *315 Civil Code. The interpretation of a contract is the determination of the common intent of the parties with courts giving the contractual words their generally prevailing meaning unless the words have acquired a technical meaning. LA. CIV.CODE arts. 2045, 2047; see e.g. Louisiana Ins. Guar. Ass'n v. Interstate Fire & Casualty Co., 93-0911, p. 5 (La.1994), 630 So.2d 759, 763.
The purpose of noncompetition agreements is to protect business from competitive disadvantage by an employee exploiting skills, knowledge or information acquired while employed by the former employer. However, an employee has a right to ply his trade or profession to sustain his livelihood. Additionally, the employer is typically the drafter of the instrument, which under contract interpretation of ambiguous terms requires construction against the contract's drafter. See LA. CIV.CODE art. 2056. Thus, in accord with Louisiana's strong public policy against restraints on trade, ambiguous provisions must be strictly construed in favor of the employee.
Bond argues that because La.Rev. Stat. § 23:921(C) provides a narrow exception that must be strictly complied with, SWAT's Agreement is overbroad. However, the Agreement specifies that Bond was prohibited from directly or indirectly competing with SWAT in specified parishes for a period of two years. The portion of the clause that prevents Bond from serving "as an officer, employee, director, agent or consultant of any business, which is in direct or indirect competition with SWAT..." fits within the exception under the statute that allows employers to prohibit an employee from "carrying on or engaging in a business similar to the employer." Under a plain reading of the contract provision, Bond is precluded from working as an employee for a business in competition with SWAT.[3]
The question then becomes whether a noncompetition agreement must mirror the words of the statute exactly to be effective, as the agreement did in Scariano Bros.; or whether the prohibition from engaging in direct or indirect competition with the employer is interpretatively the same as "carrying on or engaging in a business similar to the employer," as the third circuit found in Moreno. Under a logical interpretation of the statute, similar businesses would likely be in competition with one another for the same customers and resources. However, in some circumstances, using a plain meaning interpretation of the statute, two businesses could be similar without being in competition. For example, a construction company that specialized in constructing commercial office buildings would arguably not be a competitor of a company constructing residential homes; however, both types of construction companies would be similar. Thus, the fact that the businesses are similar is not dispositive on the issue of whether the businesses are competitors; although the converse is presumably true, i.e., dissimilar businesses are presumptively invalid under the plain language of the statute.
In light of public policy, and the strict construction that must used be against SWAT as the drafter of the agreement, a *316 more workable approach would consider whether both the former and the new employer must be competitive businesses to satisfy both the contract and the statute. Thus, the first question that must be resolved is whether NRS and SWAT are competitors. According to Bond, NRS does all types of contracting and construction work, including insurance restoration work, which constitutes 20-25% of NRS construction work. Bond defined insurance restoration work as remodeling where "we go in and take old houses or new houses and redo them ... restore them to what people want," including work after fire or storm damage, including emergency repair during normal work hours. Bond distinguishes SWAT from NRS based on the emergency repair work that SWAT performs beyond normal working hours. Bond's distinction does not establish a difference cognizable under the statute or the contract. Thus, the two business are not only similar, but also competitors.

Role with the New Employer that impacts competition
The second question then arises whether the employee is impacting the former employer's ability to compete in his or her role with the new employer. To give greatest effect to the legislature's intent in enacting La.Rev.Stat. § 23:921(C) as an exception to the rule, while still honoring Louisiana's general public policy against noncompetition agreements between employees and employers, the role of the employee with both the former and current employer is a critical analysis in determining whether the employee will impact the former employer's business. The key factor in evaluating an noncompetition clause's enforceability is the impact on the former employer's ability to compete with the new employer.
SWAT agrees that a noncompetition agreement may not absolutely restrict a person from working for a competitor in any capacity. However, SWAT argues that it is not seeking to prevent Bond from working for a competitor in any capacity, but is only seeking to prevent Bond from working in the same capacity for a competitor. SWAT points out that in his role at NRS, Bond is directly competing with SWAT; the skills he acquired as a production manager at SWAT are the same skills being used for NRS.
In his role as production manager with SWAT, Bond was responsible for coordinating a construction job upon receiving the job from a salesman, including customer interaction, and supervising up to 40 employees at a time. Crowley also testified regarding Bond's role as production RP, who runs the jobs by supervising the contractors, and production manager, who runs jobs and supervises other RPs who are running jobs.
In Bond's position with NRS, he is involved "running the job from A to Z," including the sale, planning, and actual construction work. He is in charge of preparing bids for customers, meeting with customers to obtain their preferences, and supervising the subcontractors once the construction job is underway. At the time of the deposition, Bond had 15 construction jobs going, 3 of which were flood damage restoration.
Therefore, Bond's role with NRS affected SWAT's ability to compete not only because he retained the same position with NRS that he held with SWAT, but also based on the intrinsic nature of the work itself.[4] Bond's position with both SWAT *317 and NRS involved management duties to ensure safe, financially sound, and timely completed construction projects in the insurance restoration business. In roles with both companies, he was required to control costs, interact with customers, and direct the activities of other employees. These responsibilities, whether considered direct or indirect activities, would allow Bond to have a significant impact on NRS's ability to compete with SWAT.
Additionally, Bond's job with both SWAT and NRS involved solicitation of customers.[5] At his deposition, Bond indicated that he performed sales in his role with SWAT about 15% of the time to handle customer upgrades, overflow, and vacation coverage for co-workers. He was subsequently employed by NRS on July 5th or 6th of 1998 as a Supervisor over operations, production and sales in a much broader role than performed at SWAT. In his deposition, Bond testified that in his work for NRS, he prepared bids for customers the majority of the time, and that he was involved in "the sale, the planning and the construction work itself."

Definition of the business
Bond also argues that an employer must include a definition of the employer's business in a non-compete agreement to avoid overbreadth, relying on the first and fifth circuits. See LaFourche Speech & Language Services, Inc. v. Juckett, 94-1809 (La.App. 1 Cir. 3/3/95), 652 So.2d 679; Daiquiri's III on Bourbon, Ltd. v. Wandfluh, 608 So.2d 222 (La.App.1992).[6] According to Bond, the agreement cited by the plaintiff describes Bond's duties, not the business of the employer SWAT.
In contrast to the first and fifth circuits, the third circuit has held that a specific definition of a company's business is not required based on the statutory language of La.Rev.Stat. § 23:921 and the ability to effect an oral noncompetition agreement. See Henderson Implement Co., Inc. v. Langley, 97-1197 (La.App. 3 Cir. 2/4/98), 707 So.2d 482; see also Barnett v. Jabusch, 607 So.2d 1007 (La.App. 3 Cir.1992), writ denied, 610 So.2d 820 (La.1993) (upholding an oral non-competition agreement). The plaintiff argues that La.Rev. Stat. § 23:921 on its face contains no express requirement to include a definition of the employer's business to ensure its validity, and thus, a definition is not required. SWAT further argues that in Daiquiri's, the fifth circuit did not hold that the business must be defined in the agreement but rather that the definition in the agreement was overly broad.
The Agreement defines SWAT's business as "insurance restoration construction business." The plaintiff alleges that insurance restoration work is a term of art in the construction industry, and clearly understood by Bond. During his deposition and at trial, Bond explained his definition of the term "insurance restoration construction *318 business" and indicated that he understood what the restoration business was and how it differed from conventional construction work. Bond defined insurance construction restoration work as twenty-four hour repair service responding to storm or fire damage.
At the hearing, Cowley testified regarding the nature of insurance restoration work. Insurance restoration construction occurs when any loss or peril occurs, as defined by the applicable insurance policy on the residence. Damage can include anything from traditional storm damage, to vandalism, burglary or a vehicle driven though the home. The work differs from normal construction work because a third party, the insurance company, is involved in the estimating and agreement regarding the necessary repairs. Rather than bidding jobs, the majority of SWAT's work comes from referrals from insurance agents and adjusters.
A definition of the employer's business in order to comply with LA.REV.STAT. § 23:921(C) is unnecessary. However, even interpreting the provision to impose this requirement, the evidence clearly establishes that an appropriate definition of SWAT's business exists in the non-competition agreement at issue. Complex, cumbersome, and overly detailed definitions are unnecessary to convey to the employee the scope of the job that is being protected from competition; the definition must only serve to demonstrate a common understanding between the employer and employee regarding the nature of the business.
The statutory language of La.Rev.Stat. § 23:921(C), and the legislative history, support a finding that competitors can restrict their employees from working for a business similar to the employer without limitation to situations only where the employee forms their own business or solicits the former employer's customer. Further, the Agreement between Bond and SWAT meets the statutory requirements under La.Rev.Stat. § 23:921 for a valid and enforceable noncompetition clause. Accordingly, I dissent.
NOTES
[*] James C. Gulotta, Justice Pro Tempore, sitting for Associate Justice Harry T. Lemmon.
[1] Bond left SWAT's employ for a brief period in 1995 to build nightclubs in Houston for a friend.
[2] The trial court did not reach the reconventional demands made by Bond and reserved these issues. Consequently, this opinion does not address those demands raised by Bond as plaintiff in reconvention.
[3] The court deleted the overbroad language and concluded the clause contained no remaining enforceable provisions; therefore, the noncompetition agreement was a nullity.
[4] One judge concurred, finding the rationale of Summit persuasive, but concluding that defendant's new position involved solicitation of Scariano's customers, a situation which would warrant the imposition of an injunction under the reasoning of Summit.
[5] The court also held that a phrase in the noncompetition clause prohibiting defendant from "render[ing] services" to any other person or entity directly or indirectly engaged in competition with Scariano was overbroad as it could be interpreted to prevent defendant from working in a capacity with a competitor that did not constitute "carrying on or engaging in a business similar" to that of Scariano. The court found this clause unenforceable, but applied the severability clause to hold the remaining provisions enforceable.
[6] The court also found support for its conclusion in the noncompetition provisions upheld in Dixie Parking Serv., Inc. v. Hargrove, 96-1929 (La.App. 4 Cir. 3/26/97), 691 So.2d 1316, and AMCOM of Louisiana, Inc. v. Battson, 28,171 (La.App. 2 Cir. 1/15/96), 666 So.2d 1227, rev'd, 96-0319 (La.3/29/96), 670 So.2d 1223. In Dixie Parking Service, the court enforced a noncompetition agreement wherein the employee agreed:

neither directly or indirectly to own, manage, operate, control, be employed by or participate in the ownership, management, operation or control of, or be connected in any way with any automobile parking and parking management business of the type and character engaged in and competitive with that conducted by Dixie.
Dixie, 96-1929 at p. 3, 691 So.2d at 1318. In AMCOM, this court reinstated the trial court's judgment enforcing a noncompetition agreement providing that:
EMPLOYEE agrees and represents to AMCOM,... that for a period of two (2) years following the termination of this Employment Agreement, ... EMPLOYEE will not, as principal, employer-stockholder, co-partner, employee or in any other individual or representative capacity whatsoever, enter into or engage directly or indirectly in the performances of any services for any other radio station or competitor of AMCOM located in Shreveport or Bossier City, Louisiana....
AMCOM, 28, 171 at p. 3, 666 So.2d at 1229.
Although mentioning these cases as supporting its decision, the Moreno court recognized that these decisions "did not specifically address the language in the agreements regarding the actions being prohibited...." Because these cases did not endeavor to interpret the scope of the phrase "carrying on or engaging in" found in La. R.S. 23:921(C), they are of little value when analyzing this issue in the instant case.
[7] We note the language of La. R.S. 23:921(A) was found to be susceptible of different meanings in Louisiana Smoked Products, Inc. v. Savoie's Sausage & Food Products, Inc., 96-1716 (La.7/1/97), 696 So.2d 1373.
[8] La. R.S. 23:921 was amended several times between 1989 and the present; however, none of these later amendments have any particular relevance to the instant issue. The later amendments included adding corporations and individual shareholders to the definition of "any person" under the statute, Acts 1990, No. 201; adding an exception to relating to noncompetition agreements for computer programming, Acts 1990, No. 137; adding exceptions relating to franchisors and franchisees, Acts 1991, No. 891; adding an exception relating to independent contractors, Acts 1995, No. 937; and providing for validity of choice of law and forum clauses, Acts 1999, No. 58. Several attempts were made to extend the time limit beyond two years, but none were successful.
[9] In Louisiana Smoked Products, this court, relying on a law review comment, Jeffrey D. Morgan, Comment, If At First You Don't Succeed: Louisiana's Latest Statutory Enactment Governing Agreements Not to Compete, 66 Tul. L.Rev. 551 (1991), stated that the 1989 amendment was adopted "[i]n an effort to remedy the flaws emanating from the courts' restrictive interpretation of the 1962 amendment, and to restore the legislature's original intent to the statute...." Louisiana Smoked Products, 96-1716 at p. 7, 696 So.2d at 1377 (citing Morgan, supra note 44 at 559). In making this assertion, the comment cites the Minutes of the Civil Law and Procedure Committee, 1989 Reg. Sess., May 23, 1989, and the Minutes of the Labor Committee, 1989 Reg. Sess., June 7, 1989. However, nothing in the Minutes provided to us by legislative staff concerning the bill that eventually become La. R.S. 23:921 (1989) indicates that the amendment was adopted to correct the courts' interpretation of the former version of the statute.

The only statement concerning the courts' alleged reluctance to enforce noncompetition agreements came from Representative Jenkins in 1990, when the House Committee on Labor and Industrial Relations considered a senate bill which would amend the statute to extend the validity of noncompetition agreements to corporations and individual shareholders under certain circumstances. After Representative Lancaster presented and explained the bill, the Minutes reflect that Representative Jenkins:
stated that his only concern is passing a law that the courts have been reluctant to enforce. He said the courts have been reluctant to enforce noncompetition agreements. He mentioned that noncompetition agreements give people something else to sell. It enhances the value of the business because people can sell their willingness not to compete. He added that it is unfortunate that the courts have not allowed it to go past two years.
Minutes of the Committee on Labor and Industrial Relations, La. House of Representatives, 1990 Reg. Sess., June 1, 1990. The bill upon which Representative Jenkins commented was reported favorably by unanimous vote and ultimately passed notwithstanding the statements made by Representative Jenkins. These comments obviously cannot be said to have any bearing on the amendment of the statute in the previous year.
[10] This portion of La. R.S. 23:921 is not at issue in the present case. Although SWAT initially appeared to invoke this portion of the statute in its original petition, the allegation that Bond attempted to solicit SWAT's customers after leaving their employ was not urged or ruled upon below, and counsel for SWAT stated in oral argument before this court that this case did not involve any such allegation or issue.
[11] Bond also argues that scope of the prohibition set forth in the agreement exceeds the exception provided by La. R.S. 23:921(C) in that it seeks to prohibit him from recruiting employees of the employer. See Non-Competition clause, ¶¶ (b) and (c). Although the issue of Bond's solicitation of SWAT's employees was raised in plaintiff's petition and brought out in Bond's deposition, we do not address this argument as neither the trial court nor the court of appeal ruled on it and find it was not properly preserved on appeal.
[12] There was conflicting evidence presented below as to whether Bond did, in fact, perform the same duties with NRS as he did with SWAT. The trial court found as a matter of fact that Bond worked as a production manager for both NRS and SWAT, and we will accept this conclusion.
[13] The court of appeal also severed the language prohibiting Bond from directly or indirectly engaging in competition with SWAT. Because we find this language may conceivably be construed to comport with the requirements of La. R.S. 23:921(C), we are not required to sever it and will instead refuse to construe it as prohibiting Bond from being employed by a competitor of SWAT.
[14] We do not suggest, however, that the remaining portions of the Agreement are enforceable against Bond. Rather, we find only that the portions declared overbroad in today's decision may be severed with the remaining sections, which may or may not be valid, being left for consideration on another day.
[1] The majority suggests that these comments by Rep. Jenkins are irrelevant to the bill passed in 1989. However, the complete redrafting of the statute in 1989, with subsequent amendments to that same statute almost every year, are hardly "irrelevant" to the issue of legislative intent. The meaning and intent of a law is determined by considering the law in its entirety and all other laws on the same subject matter and placing a construction on the provision in question that is consistent with the express terms of the law and with the obvious intent of the legislature in enacting it. Stogner, 98-3044 at p. 2, 739 So.2d at 762.
[2] In oral argument, several members of the panel seemed particularly concerned about doctors and lawyers. First, lawyers are precluded from signing or requesting one another to execute noncompete agreements by their own code of professional conduct. See La. R. of Prof. Cond. 5.6. Second, while the majority's approach helps the doctor employed by the local hospital, it does nothing for the doctor hired as an independent contractor by that same hospital (of which many are) or the doctor who seeks to establish a more lucrative private practice.
[3] Arguably the term "indirect" could be construed as ambiguous by including businesses that are not competitors. Because NRS, and Bond through his role with NRS, is competing directly with SWAT, no reason exists to address what might be the holding under certain hypothetical situations where an employee is "indirectly" engaged in competition or a business that is in "indirect competition" because those facts are not before us. However, those circumstances, if overbroad, could be remedied by blue-line reformation of the offending phrase. See Scariano Bros., 719 So.2d at 135; Henderson, 707 So.2d at 482.
[4] Neither duties, nor the same position with both companies, is necessarily determinative. An individual could transfer between competitors in the same role, yet not impact the former employer's ability to compete, i.e., the maintenance man in the medical field as suggested in Summit. On the other hand, an employee could change roles between the competitors, and in his role with the new employer, significantly impact the former employer. Thus, while a factual determination of duties may be necessary, an employee's transfer in the same position between two competitors creates a strong presumption that the role will have a significant impact on the former employer.
[5] Based on oral argument, the majority concludes that solicitation of customers was not at issue. While SWAT did not argue that Bond "intentionally" solicited SWAT's customers, SWAT stated at oral argument that there was evidence in the record, in the form of Bond's deposition that was submitted at trial, regarding Bond's involvement in sales.
[6] The court of appeal not reach the defendant's argument that SWAT's business was not adequately defined in the agreement, rendering it unenforceable.