STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

21-322


SETPOINT INTEGRATED SOLUTIONS, INC.

VERSUS

WILLIAM KITELEY, ET AL.


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2016-1724
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

**********

JOHN E. CONERY
JUDGE

**********

Court composed of John E. Conery, D. Kent Savoie, and Sharon Darville Wilson, Judges.


REVERSED IN PART; AFFIRMED IN PART AND RENDERED.

**J. Lee Hoffoss, Jr.**
**Donald McKnight**
**Hoffoss Devall, LLC**
**517 West College Street**
**Lake Charles, Louisiana  70605**
**(337) 433-2053**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Setpoint Integrated Solutions, Inc**


**Thomas H. Kiggans**
**Taylor J. Crousillac**
**Phelps Dunbar, LLP**
**Post Office Box 4412**
**Baton Rouge, Louisiana  70821-4412**
**(225) 346-0285**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Setpoint Integrated Solutions, Inc.**


**Eric Ray Miller**
**Christine S. Keenan**
**Elizabeth Bailly Bloch**
**The Kullman Firm APLC**
**4605 Blue Bonnet Boulevard, Suite A**
**Baton Rouge, Louisiana  70809**
**(225) 906-4250**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Joseph G. Jobe**


**Rick J Norman**
**Joseph P. Norman**
**Norman Business Law Center**
**145 East Street**
**Lake Charles, Louisiana  70601**
**(337) 436-7787**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Brent Walker**


**Michael Keith Prudhomme**
**Mudd & Bruchhaus, LLC**
**410 East College Street**
**Lake Charles, Louisiana  70605**
**(337) 562-2327**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Jacob Hathaway**

**Thomas John McGoey, II**
**Liskow & Lewis**
**One Shell Square**
**701 Poydras, Suite 5000**
**New Orleans, Louisiana  70139**
**(504) 581-7979**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **William Kiteley**
    **Caliber Valve & Controls**

**CONERY, Judge.**

Plaintiff, Setpoint Integrated Solutions, Inc. (Setpoint), filed this suit against its former Chairman, Joseph "Joey" Jobe, seeking damages associated with, among other things, a purported breach of a non-competition agreement entered into after Mr. Jobe's separation of service from the company. A jury rendered judgment in favor of Setpoint, finding that Mr. Jobe breached the non-compete agreement and awarding associated damages. The trial court thereafter awarded Setpoint attorney fees related to its prosecution of the claim, but denied Mr. Jobe's request for attorney fees he sought following dismissed claims under the Louisiana Unfair Trade Practices Act (LUTPA) and the Louisiana Uniform Trade Secrets Act (LUTSA). Mr. Jobe filed this appeal. For the following reasons, we reverse in part, affirm in part, and render judgment.

## FACTS AND PROCEDURAL HISTORY

Setpoint is engaged in the distribution and servicing of industrial control valves and valve instrumentation and equipment, doing so in both Baton Rouge and Lake Charles. Setpoint instituted this matter in April 2016, naming its former Vice-President, William Kiteley, and former Regional Sales Manager, Brent Walker, as defendants. As Setpoint noted in the petition, both resigned their Setpoint positions on February 18, 2016 and immediately opened and began operating their newly formed company, Caliber Valve and Controls, LLC ("Caliber"). Setpoint also named Caliber as a defendant in its April 2016 petition.

The record substantiates Setpoint's allegations that Mr. Kiteley and Mr. Walker developed Caliber, a competitor of Setpoint, while still employed at Setpoint. Setpoint's initial claims included breach of contract, tortious interference with business, and, pertinent to this matter, claims under the Louisiana Uniform

Trade Secrets Act (LUTSA), La.R.S. 51:1432, *et seq.*, and the Louisiana Unfair Trade Practices and Consumer Protection Law (LUTPA), La.R.S. 51:1401, *et seq.*

Setpoint filed its second supplemental and amended petition in December 2016, adding Mr. Jobe, its former Chairman, as a defendant. Mr. Jobe had served as the President and CEO of Setpoint (as well as its preceding corporate identities) from 2003 through April 2015. Setpoint transitioned Mr. Jobe from his earlier roles in April 2015 and named him Chairman at that time, a newly created position. Mr. Jobe's responsibilities were drastically curtailed in this latter and newly formed position, with Mr. Jobe functioning in a merely advisory capacity. Jack Guidry, President and CEO of Setpoint's parent company, PVI Holdings, assumed Mr. Jobe's roles as President and CEO of Setpoint in April of 2015.

The record indicates that Mr. Jobe served as Chairman of Setpoint until October 30, 2015, when Mr. Guidry informed Mr. Jobe over a lunch meeting[1] that his employment with Setpoint was terminated effective immediately.[2] Mr. Guidry informed Mr. Jobe that, in order to receive a severance payment, he would be required to enter into a separation agreement which would include a waiver of all potential claims Mr. Jobe could have against Setpoint and a non-competition agreement. Mr. Guidry informed Setpoint employees of Mr. Jobe's departure from the company by internal memo of November 3, 2015.

Through counsel, Mr. Jobe and Setpoint negotiated the issues surrounding the potential severance pay and non-competition agreement in the ensuing days. The

---

[1] The record most consistently reports the lunch meeting as occurring on October 30, 2015, but certain references in the record place the meeting on October 29, 2015.

[2] Mr. Jobe explained that upon the termination of employment at the lunch meeting with Mr. Guidry, he only returned to his office to gather personal items.

negotiations resulted in the November 25, 2015 "Separation Agreement and General Release" now at issue in this appeal.

Identifying Setpoint as the "Company" and Mr. Jobe as the "Employee," the Separation Agreement provided, in pertinent part:

## SEPARATION AGREEMENT AND GENERAL RELEASE

THIS SEPARATION AGREEMENT AND GENERAL RELEASE (the "**Release**") is made and entered into as of this 25th day of November, 2015, by and between Setpoint Integrated Solutions, Inc. (the "**Company**"), and Joseph G. Jobe (the "**Employee**").

. . . .

1.      Termination of Employment.      Effective the close of business on October 30, 2015 (the "**Termination Date**"), the Employee and the Company agree that the Employee's employment with the Company is terminated.  The Employee further agrees that he will not hereafter seek reinstatement, recall or re-employment with the Company.  The Employee hereby acknowledges and agrees that effective October 30, 2015, he has resigned from all positions he holds as an officer with the Company and its affiliates and that as of such date, he has no right, individually, to bind or act on behalf of the Company or any of its affiliates.

2.      Payments.

(a)      Settlement Payments.      As a settlement payment, the Company shall pay the Employee separation pay in the amount of $138,422.05 (equal to six (6) months of base pay) minus normal withholding taxes and deductions.  This amount will be paid to the employee in substantially equal installments over six (6) months, in accordance with the Company's payroll policy from time to time in effect, with the first payment to be made on the first payroll date five or more days following expiration of the revocation period set forth in Paragraph 9(c).

. . . .

3.      General Release.  As a material inducement to the Company to enter into this Release and in consideration of the payments to be made by the Company to the Employee in accordance with Paragraph 2 above, the Employee … and with full understanding of the contents and legal effect of this Release and having the right and opportunity to consult with his counsel, releases and discharges the Company [and related persons and entities] from any and all claims,

actions, causes of action, grievances, suits, charges, or complaints of any kind or nature whatsoever, that he ever had or now has, whether fixed or contingent, liquidated or unliquidated, known or unknown, suspected or unsuspected, and whether arising in tort, contract, statute, or equity, before any federal, state, local, or private court, agency, arbitrator, mediator, or other entity, regardless of the relief or remedy ….

. . . .

6.      Protective Covenants. The Employee acknowledges and agrees that the term of Employment Agreement ended but the provisions of Paragraph 5 thereof (the "**Protective Covenants**") continue in effect, including Paragraph 5(a) which continues in effect through December 31, 2016.   The Protective Covenants are incorporated herein by reference and deemed to be a part of this Release[. . . .]

This latter provision incorporated, by reference, Mr. Jobe's 2011 Employment Agreement," which included the non-competition agreement central to Setpoint's action against Mr. Jobe.   The 2011 Employment Agreement's pertinent non-competition clause provided:

[5.] (a)      Non-Competition. During the Employment Period and for a period beginning on the date hereof and ending on that date which is two (2) years following the termination of Executive's employment hereunder, Executive shall not, directly or indirectly, on his own behalf or on behalf of any other person or as or as an officer, director, consultant, shareholder, independent contractor, partner, principal, sole proprietor or in any other capacity, without the prior written consent of the Corporation:

(i)      engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, associated with, or in any manner connected with, lend Executive's credit to, or render services or advice to, any business engaged, in those parishes and municipalities set forth in Schedule 5.1(a)(i) …, in the business of distribution or service of control valve instrumentation and equipment[.][3]

---

[3] Although of secondary importance for purposes of this appeal, the non-competition agreement further prohibited Mr. Jobe from:

(ii)      solicit[ing] business, for products or services offered, sold, produced or under active development by the Corporation during the Employment Period and

By its second supplemental and amended petition, Setpoint alleged that Mr. Jobe violated the November 3, 2015 Separation Agreement by assisting/working with the other defendants in competition with Setpoint. Setpoint asserted that the defendants acted in concert to conceal Mr. Jobe's assistance in the development of Caliber, which became operational the day that Mr. Kiteley and Mr. Walker left Setpoint. Setpoint alleged that Caliber thereafter obtained work from Setpoint's customers, allegedly based upon the unlawful use of certain proprietary information.

In addition to the allegation of breach of the Separation Agreement, Setpoint asserted that Mr. Jobe acted with the other defendants in violations of the LUTSA and LUTPA. Raising a claim of civil conspiracy among the defendants, Setpoint maintained that the defendants should be solidarily bound for all damages.

Setpoint reached a settlement with all defendants other than Mr. Jobe in October 2018. The record is silent with regard to the terms of that settlement. However, following the settlement, Setpoint dismissed its claims under LUTPA and LUTSA against Mr. Jobe, proceeding to trial solely on its claims of breach of contract under the terms of the Separation Agreement, as well as a claim of breach of fiduciary duty and fraud, as raised by its February 2019 third supplemental petition.

---

on the date of such termination of the Employment Period, from any person, firm, corporation, or other business entity which did business with, or was a customer or account of, the Corporation during the two-year period immediately prior to the date of such termination, or which, during the six months immediately prior to the date of such termination, had been solicited by the Corporation; or

 (iii) solicit for employment any employee of the Corporation (or any person who was employed by the Corporation during the six month period preceding such solicitation), nor agree to hire any employee of the Corporation (or any person who was employed by the Corporation during the six month period preceding such hire), nor otherwise knowingly interfere with the relations of the Corporation with any of its employees.

By this latter claim, Setpoint alleged that between the period of October 30, 2015, when his employment was terminated, and November 25, 2015, when he formally resigned as an officer (with a retroactive resignation date of October 30, 2015), Mr. Jobe owed a "duty of loyalty and to act in accordance with Louisiana law relative to corporate officers and directors" and that the duty "extended to at least November 25, 2015." Setpoint alleged that, during this time period, Mr. Jobe actively assisted Mr. Kiteley and Mr. Walker in the creation of Caliber.

However, Mr. Kiteley explained that he and Mr. Walker worked toward the creation of Caliber while still employed at Setpoint. Text messages and emails between Mr. Kiteley and Mr. Jobe, which were introduced into evidence, confirmed that the foundational work in the creation of Caliber was performed in early 2016, well after Mr. Jobe had been terminated on October 30, 2015. Mr. Kiteley explained that Caliber became operational on the day of his resignation from Setpoint, February 18, 2016. Reference to The Articles of Organization and Initial Report of Caliber indicates that it was recorded by Secretary of State on that same date, February 18, 2016.

Setpoint's claim against Mr. Jobe proceeded to a six-day jury trial in March 2020. At trial, Setpoint acknowledged that Mr. Jobe was not a member of Caliber nor did he work as an employee of former defendants Mr. Kiteley and Mr. Walker and alleged competing company Caliber. Setpoint instead focused on that aspect of Mr. Jobe's non-competition agreement prohibiting Mr. Jobe from rendering "services or advice to, any business engaged…, in the business of distribution or service of control valve instrumentation and equipment[.]"

In addition to witness testimony, Setpoint introduced text and email messages revealing Mr. Jobe's communications with Mr. Kiteley, in particular, and others

more generally, in the time period leading up to the formation of Caliber. Setpoint suggested that the communications demonstrated that Mr. Jobe assisted Mr. Kiteley and Mr. Walker in attempting to find a valve supplier; worked with a design branding firm to create a name and marketing concept for Caliber; worked with others in crafting a PowerPoint presentation and mission statement for the start-up company; referred Mr. Kiteley and Mr. Walker to his own business attorney; and further met alone with Caliber's attorney. That attorney subsequently created Caliber's Articles of Incorporation. Setpoint further presented both testimony and messages demonstrating Mr. Jobe's role in Caliber's search for a building for its operations and alleged that he was integral in the negotiations surrounding the resulting lease. Finally, Setpoint argued to the jury that Mr. Jobe assisted in evaluating prospective hires and in creating a strategy for submitting bids for prospective work for which Setpoint was a competitor.

At the close of the parties' respective cases, the trial court entertained motions for directed verdict raised by both Setpoint and Mr. Jobe. The trial court denied Mr. Jobe's motions, except on the single claim of fraud, which the trial court granted, finding the fraud claim duplicative and confusing. The trial court denied Setpoint's motion for directed verdict in full.

Relevant to the considerations at issue in this appeal, the jury returned a verdict in favor of Setpoint, answering affirmatively to the question of whether Setpoint had proven that Mr. Jobe "breached the non-compete agreement within 13 months after his employment with Setpoint was terminated[.]" The jury awarded $137,422.05 to Setpoint for "losses sustained and profits deprived as a result of Jobe's breach of the non-compete agreement." That figure reflects the amount paid to Jobe under the terms of the Separation Agreement, less a $1,000 reimbursement

that had been paid to Jobe for the specific release of any claim he may have had under the Age Discrimination in Employment Act (ADEA). The jury further responded "no" when asked whether Setpoint had mitigated its damages.

The jury rejected Setpoint's claim that Jobe "owed a fiduciary duty and duty of loyalty to Setpoint as an officer of the company between October 30, 2015 and November 25, 2015." The trial court reduced the jury's verdict to a March 23, 2020 judgment, awarding Setpoint $137,422.05, one of two alternative claims for damages pursued by the company.[4]

In August 2020, the trial court considered a number of post-trial motions, including Mr. Jobe's Motion for Judgment Notwithstanding the Verdict or, in the alternative, Motion for New Trial or Remittitur. Mr. Jobe argued in part, that the non-competition agreement was unenforceable as a matter of law as it did not meet any of the strictly-construed statutory exceptions therefor. In particular **he argued that his employment with Setpoint had been terminated prior to execution of the Separation Agreement and that its non-competition agreement could not meet the statutory exception applicable to employers/employees**. (Emphasis added.) Mr. Jobe alternatively argued that the terms of the non-competition agreement itself were unenforceable as overbroad. The trial court denied the motion.

The trial court also considered Setpoint's motions to assess attorney fees and costs, as well as Mr. Jobe's motion for attorney fees for what he argued was Setpoint's bad faith pursuit of its initial claims under LUTSA and LUTPA. The trial court denied Mr. Jobe's motion, but granted Setpoint's motion to assess attorney

---

[4] The jury awarded the figure paid by Setpoint in consideration of the Separation Agreement, less $1,000 as stipulated consideration for Mr. Jobe's waiver of claims under the ADEA.

fees and costs as an extension of the jury's finding of breach of the non-competition clause of the contract. The resulting October 16, 2020 judgment reflected the trial court's award of attorney fees in the amount of $508,491.00, more than four (4) times the amount of damages awarded, plus costs in the amount of $44,745.61.

Mr. Jobe filed a timely appeal questioning both the jury's verdict and numerous rulings of the trial court.

## ASSIGNMENTS OF ERROR AND ANSWER TO THE APPEAL

Mr. Jobe assigns the following as error:

1. The jury erred in finding that Jobe breached his non-compete agreement.

2. The jury erred as a matter of law in awarding Setpoint damages in the amount of $137,422.05.

3. The Trial Court erred in denying Jobe's Motion for Judgment Notwithstanding the Verdict ("JNOV").

4. The Trial Court erred in denying Jobe's Motion for New Trial or Remitt[it]ur on damages assessed against Jobe.

5. The Trial Court erred in denying Jobe's Motion to Compel Production of Settlement Agreement.

6. The Trial Court erred in awarding Setpoint's attorneys' fees in the amount of $50[8],491.00.

7. The Trial Court erred in taxing costs against Jobe in the amount of $44,745.60.

8. The Trial Court erred in denying Jobe's motion for attorneys' fees on the LUTSA and LUTPA claims.

Setpoint filed an answer to the appeal, seeking additional attorney fees for work performed on appeal.

We address the parties' submissions in turn.

**DISCUSSION**

*Breach of the Non-Compete Agreement*

Mr. Jobe first contends that the jury's determination that he breached the non-competition agreement is inconsistent with Louisiana statutory law. Within his first assignment of error, he questions both the validity of the non-competition agreement pursuant to La.R.S. 23:921 and, alternatively, the merits of the jury's finding that he breached the non-competition agreement. As Mr. Jobe explains, the question regarding the enforceability of the non-competition agreement as a matter of law was presented to the trial court through his Motion for JNOV. He contends that the trial court erred in denying that motion. We agree.

Louisiana Code of Civil Procedure Article 1811 provides for the trial court's issuance of a judgment notwithstanding the verdict. The granting of a motion for JNOV is warranted when the facts and inferences are so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable men could not arrive at a contrary verdict. *Anderson v. New Orleans Pub. Serv., Inc.*, 583 So.2d 829 (La.1991). In this case, the question posed to the trial court via the motion for JNOV was not only one involving a factual inquiry, but one involving a legal inquiry that involves the enforceability of a non-competition agreement. *See Navarre Chevrolet, Inc. v. Begnaud*, 16-465 (La.App. 3 Cir. 11/2/16), 205 So.3d 973, *writ denied*, 16-2122 (La. 1/13/17), 215 So.3d 248; *Hixson Autoplex of Alexandria, Inc. v. Lewis*, 08-1142 (La.App. 3 Cir. 4/1/09), 6 So.3d 423, *writ denied*, 09-0955 (La. 5/29/09), 9 So.3d 170.

On appeal, the trial court's ruling on a motion for JNOV is subject to a two-part inquiry, first requiring the appellate court to determine whether the trial court erred in its ruling on the motion using the same criteria as that used by the trial court.

10

*Davis v. Wal-Mart Stores, Inc.*, 00-0445 (La. 11/28/00), 774 So.2d 84. In this case, we find both manifest error related to the factual inquiry and legal error in the application of those facts to the statutory requirements of La.R.S. 23:921.

The Louisiana Legislature has spoken with regard to non-competition agreements via La.R.S. 23:921(A)(1), expressing a general prohibition on restraint of business as follows:

> Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void.

The supreme court has further explained that Louisiana's "strong public policy" against restraint of trade as expressed by Paragraph (A)(1), "is based upon an underlying state desire to prevent an individual from contractually depriving himself of the ability to support himself and consequently becoming a public burden." *Swat 24 Shreveport Bossier, Inc. v. Bond*, 00-1695, p. 5 (La. 6/29/01), 808 So.2d 294, 298.

The legislature provided specific, enumerated exceptions to the restraint on business, including La.R.S. 23:921(C), which provides, in pertinent part:

> *Any person*, including a corporation and the individual shareholders of such corporation, *who is employed as an agent, servant, or employee may agree with his employer to refrain from carrying on or engaging in* a business similar to that of the employer and/or from soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, so long as the employer carries on a like business therein, not to exceed a period of two years from termination of employment . . . .

(Emphasis added.) In *Swat 24*, 808 So.3d 294, the supreme court specifically identified the employer/employee relationship as one of the enumerated exceptions. The supreme court further explained that given that non-competition agreements

11

"are in derogation of the common right, they must be strictly construed against their enforcement." *Id.* at 298.

The rule of strict construction, as enunciated in *Swat 24*, applies "'whether the agreement is in the form of restrictions on competition by a former employee, restrictions on competition by the seller of a business, *or some other variation which has the effect of limiting competition.*'" *Herff Jones, Inc. v. Girouard*, 07-0393, pp. 8-9 (La.App. 3 Cir. 10/3/07), 966 So.2d 1127, 1134 (emphasis added) (quoting *Boswell v. Iem*, 37,713, p. 5 (La.App. 2 Cir. 10/31/03), 859 So.2d 944, 947), *writs denied*, 07-2463, 07-2464 (La. 2/15/08), 976 So.2d 185. A panel of this court has specifically extended the strict construction methodology to considerations of whether the party seeking to enforce a non-competition agreement has demonstrated the existence of one of the enumerated exceptions. *See*, *e.g.*, *Herff*, 966 So.2d 1127.

In his first argument in his appellant's brief, Mr. Jobe correctly explains that the only exception applicable to the general prohibition on non-competition agreements that is arguably present in this case is that of the employer/employee relationship. Mr. Jobe, however, asserts that, although the Separation Agreement was entered into on November 25, 2015, his employment was actually terminated on October 30, 2015, as memorialized in that agreement. Mr. Jobe points to the terms of the Separation Agreement for the proposition that "at the time Jobe received and then signed the Separation Agreement containing a non-competition restriction, Jobe was not employed as an agent, servant, or shareholder at Setpoint." Continuing, Mr. Jobe explains that, as a consequence, "the noncompetition provision contained in the Separation Agreement did not fall within any of the permitted exceptions to La.R.S. 23:921, thereby rendering the provision null and void as a matter of law."

12

Setpoint, however, asserts that the subject non-competition agreement "arose out of the termination of his employment." Setpoint characterizes the evidence as demonstrating that Mr. Guidry merely informed Mr. Jobe at their October 30, 2015 lunch meeting that his employment was being terminated and that "Setpoint was willing to offer Jobe a severance package, and during their meeting, while Jobe was still an employee of Setpoint, Guidry gave Jobe the proposed agreement."

Setpoint maintains in its brief that, "[i]nstead of requiring Jobe to accept or reject it on the spot, Guidry told Jobe to consider the Agreement and review it thoroughly with his attorney." Setpoint contends that, during the ensuing negotiations surrounding the Separation Agreement, Mr. Jobe's attorney never indicated to Setpoint "that Jobe could no longer sign a non-competition because he was no longer employed." It notes that following the execution of the Separation Agreement on November 25, 2015, Setpoint provided severance payments over a six-month period, which Setpoint characterizes as indicative of Mr. Jobe having "remained on Setpoint's payroll until June 2016." Setpoint suggests that given such evidence, "the judge and jury correctly found that Jobe was actually given the Agreement while he was still an employee, and the only reason he signed the Agreement after his employment ended was because Setpoint gave him time to consider it carefully and have it reviewed by his attorney."

Setpoint rejects Mr. Jobe's position that he was not an employee of Setpoint on the day he signed the Separation Agreement, explaining that Mr. Jobe's "argument is wrong and has been rejected by the only reported decision addressing it." Setpoint thereafter equates Mr. Jobe's status to that of the defendant in *McCord v. West*, 07-958 (La.App. 5 Cir. 3/25/08), 983 So.2d 133, a case in which the court determined under the facts and circumstances of that case that a non-competition

13

agreement was enforceable, although the defendant, Mr. West, signed the agreement after the employer, Mr. McCord, terminated Mr. West's employment.

Mr. Jobe's situation differs from that of Mr. West in *McCord* however. In that case, Mr. McCord presented Mr. West with the non-competition agreement *prior* to the termination of his employment, and the parties entered into negotiations at that time. In the present case, however, contrary to counsel for Setpoint's argument, Mr. Jobe's employment was actually terminated *prior* to Setpoint's presentation of the separation agreement to him, as evidenced by testimony and documentary evidence in the record.

Of greater significance, the continuing nexus of Mr. West's employment at the time the parties entered into the non-competition agreement can be seen by reference to *McCord v. West*, 983 So.2d at 140, wherein the panel explained:

> We find that [the] parties entered into the 2002 Supplemental Agreement in order to resolve their differences under the Sales Agreements, which, according to this record, began sometime in 2001, and further, to resolve employment-related issues. *West continued to be employed by McCord, at least on a part-time basis and according to the employment agreement between the parties, while the parties attempted to resolve their issues.* Given that the 2002 Supplemental Agreement was made in order to resolve issues stemming from the 2000 sales agreements, including the issues of West's employment, and given that it was signed in such close temporal proximity to West's employment with McCord, we find that the 2002 Supplemental Agreement is not invalid as a matter of law merely because West had left McCord's employment one week earlier.

(Emphasis added.)

In contrast to *McCord*, Mr. Jobe did not continue to be employed in any capacity. The Separation Agreement, and by extension the non-competition agreement, was entered into to resolve issues related to a severance payment, waiver of rights, and an extension of the earlier non-competition agreement that had expired. No discussion remained underway regarding "employment-related issues" or the

potential of whether employment could continue. Rather, as evidenced by both testimony and documentary evidence, Mr. Jobe's employment was actually terminated as of October 30, 2015, and the Separation Agreement was presented thereafter. The record is replete with such evidence. Only by argument—not by reliance on evidence—can Setpoint assert that any continuum of employment existed. The evidence instead indicates only termination, effective October 30, 2015.

For instance, in Setpoint's second amended petition, by which Setpoint added Mr. Jobe as a defendant to its pre-existing suit against Mr. Kiteley and Mr. Walker, Setpoint alleged that: "*In October 2015, Jobe's employment with Setpoint ended. In connection with his departure from Setpoint, Jobe entered into a Separation Agreement with Setpoint on November 25, 2015. The Separation Agreement provided Jobe with a substantial severance payment.*" (Emphasis added.)

Mr. Jobe was adamant in his testimony that his employment with Setpoint was terminated in October 2015 over lunch with Setpoint's President and CEO, Jack Guidry. After he was fired, he explained that he was thereafter presented with the preliminary draft Separation Agreement and was encouraged to consult an attorney. Negotiations between Mr. Jobe, via his attorney, and counsel for Setpoint then began and resulted in the November 25, 2015 Separation Agreement, which, except as to the non-competition provision, may otherwise be binding between the parties. At no time did the negotiations involve the continuation of Mr. Jobe's employment or the potential of Mr. Jobe's return to employment with Setpoint. Mr. Jobe cleared out his desk and left Setpoint for good on October 30, 2015.

That testimony is corroborated in Mr. Guidry's *November 3, 2015* letter to Setpoint employees informing them of Mr. Jobe's departure from the company. The

letter, on Setpoint letterhead, was plainly crafted and disseminated three weeks before the completion of the November 25, 2015 Separation Agreement. Mr. Guidry explained in the November 3, 2015 letter that:

> Dear Colleagues,
>
> I would like to inform you that Joey Jobe has left Setpoint Integrated Solutions.
>
> We want to thank Joey for his leadership and strategic vision during the almost 23 years with the company, including 12 years as President. Joey has guided Setpoint through extraordinary growth where the Company's revenues nearly tripled during his tenure. Joey's leadership was key during the Pon acquisition as well as the merger of two separate companies – DMC and Carter Chambers. Also, Joey was responsible for the successful acquisition of LVS into the Pon family.
>
> Joey's guidance and influence was key to growing Setpoint to the company it is today. I will continue to lead our growth strategy going forward for both PVI and Setpoint. We have made the decision to further delay the search for a new President and CEO at Setpoint until the execution phase of our long-term strategy is well under way. This will help to further strengthen the organization and ensure the success of Setpoint into this next phase of our growth plans.
>
> It is with warmest personal regards that we wish Joey much success. Thank you all for your continued support, I'm confident that we will continue to build on the momentum and success of the company.

Mr. Guidry signed the November 3, 2015 letter as "President and CEO" of Setpoint and its parent company, PVI. Mr. Jobe confirmed that he was "already gone from Setpoint" at the time the letter was delivered. Mr. Jobe explained that after Mr. Guidry's letter, his telephone began "blowing up" with calls from Setpoint employees upon their receipt of the letter and that he confirmed "that it was the company's decision to let me go."

Referencing the November 25, 2015 Separation Agreement, Mr. Jobe acknowledged that it identified the date of the "Termination of Employment" as October 30, 2015. He testified that his employment was actually terminated over

lunch with Mr. Guidry three or four days before that, but that it took him a few days to clean out his office. Mr. Jobe explained that "I think the 30th was the last day that I put my last things in the car[.]" He denied he had any ongoing obligations to Setpoint after that date, nor did Mr. Guidry inform him that he did.

Mr. Guidry's testimony, offered by his deposition, also confirmed that he terminated Mr. Jobe's employment at their October 2015 lunch meeting. Mr. Guidry explained that it was his decision to terminate Mr. Jobe's employment. Although he could not recall the date of the lunch meeting, Mr. Guidry explained:

> I think I asked him to lunch. We went to lunch somewhere close by Setpoint. I - - I talked to him, I said that - - I don't know the specifics, but general conversation was we kind of went back through the reason we agreed on this chairman position, that it should be a strategic level, and - - and not at a tactical level, and that we would execute on the strategy that we set forth, and that the way he'd been approaching it, it felt like it wasn't going to work from this chairman position, so it was best if we separate ways. I believe, after that, we drove back to the office, I presented him with the separation agreement, said that, "You really should get an attorney and look at this before you make any decision."

When asked whether the Separation Agreement draft had been prepared before he "met with Mr. Jobe and notified him of the termination[,]" Mr. Guidry replied, "I believe so." He explained that he could have "given it to him at lunch," Mr. Guidry "believed" that he did so after they returned from lunch. When asked about Mr. Jobe's response upon learning of the termination, Mr. Guidry stated that, **"I think he said, 'So, this is effective immediately?' I said yes."** (Emphasis added.)

Finally, an exchange between counsel for Mr. Jobe and Mr. Guidry, which occurred during Mr. Guidry's deposition and which was played at trial, revealed:

> Q. **When you notified Mr. Jobe of his termination on or about October 30, 2015, you considered that to be an immediate termination?**

**A.** **Yes. As we said, that your responsibilities are, effective immediately, terminated, and if you won't agree with the separation agreement, you need to talk to your attorneys.**

(Emphasis added.)

Although doing so largely within the context of its arguments surrounding the claim of breach of fiduciary duty, Setpoint continues to assert that regardless of any dispute as to the immediacy of the termination of Mr. Jobe's employment, his status as an officer of the company continued throughout the time period of the negotiations surrounding the Separation Agreement, as he had neither resigned from that position nor had he been otherwise removed by the board of directors. *See* La.R.S. 12:1-843.[5]

Setpoint's equivocation as to the date of the termination of Mr. Jobe's employment or of his status as an officer is contrary to Setpoint's own evidence. Setpoint introduced the testimony of Michael Turner, Setpoint's Vice President of

---

[5] Louisiana Revised Statutes 12:1-843, contained within the Business Corporation Act, provides:

A. An officer may resign at any time by delivering notice to the corporation. A resignation is effective when the notice is effective unless the notice specifies a later effective time. If a resignation is made effective at a later time and the board or the appointing officer accepts the future effective time, the board or the appointing officer may fill the pending vacancy before the effective time if the board or the appointing officer provides that the successor does not take office until the effective time.

B. An officer may be removed at any time with or without cause by any of the following:

(1) The board of directors.

(2) The appointing officer, unless the bylaws or the board of directors provide otherwise.

(3) Any other officer if authorized by the bylaws or the board of directors.

C. In this Section, "appointing officer" means the officer, including any successor to that officer, who appointed the officer resigning or being removed.

Human Resources. Mr. Turner explained that he had access to all official corporate documents, including a May 4, 2015 Unanimous Written Consent of Directors, which reflected numerous resolutions adopted by Setpoint's Board. Setpoint introduced the document as Exhibit P-5 and, although the two-page document referenced Setpoint's bylaws as "Exhibit A," no such attachment was included in the exhibit. Neither did Setpoint otherwise introduce the bylaws into evidence. Instead, Setpoint relied on Mr. Turner's testimony regarding his understanding of the bylaws. When asked if he had seen the bylaws, Mr. Turner stated: "I believe I have, yes, sir."

On its own, the May 4, 2015 Unanimous Written Consent of Directors established Mr. Guidry, as Chairman of the Board and Chief Executive Officer, and Mr. Jobe, as Chairman, as officers of Setpoint. The document further indicated that the officers would "hold office until such time as their respective successors have been duly elected and qualified or until their earlier death, resignation **or removal**." (Emphasis added.) Setpoint's position regarding Mr. Jobe's ongoing responsibilities as an officer between the date of termination of employment and the signing of the Separation Agreement is likewise undermined by Mr. Turner's trial testimony, which showed that while Mr. Turner was initially hesitant regarding whether Mr. Jobe retained officer status following the termination of his employment, he ultimately acknowledged:

> Q I'm just saying that the bylaws authorize the president and CEO to terminate an employee, correct, *to terminate an officer*?
>
> A I believe so, yes, sir.
>
> Q And, we've established that Mr. Guidry had that authority.
>
> A That's correct.

(Emphasis added.)

Mr. Turner's testimony further undermines Setpoint's contention in its brief to this court that Mr. Jobe remained on its "payroll" for six months due to the severance payment. Mr. Turner clearly defined the difference between the final payment of Mr. Turner's **salary** with the institution of the severance payments, which began *only after the signing of the Separation Agreement*. The two types of payment—salary and severance—are separate and distinct. The transcript of Mr. Turner's testimony in this regard indicates:

Q So, it's Setpoint['s] contention that, even though he was terminated, he wasn't getting paid by Setpoint; was he? He wasn't drawing any more salary; correct?

A Correct. His severance payments were still being made. That's correct.

Q His severance payments were being negotiated.

A They were being negotiated, yeah, prior to November 25th and after October 30th.

Q Right. So, but he was not still receiving any salary; correct?

A. No, sir.

Q Okay.

A Except for his final paycheck which would have come after October 30th.

Further, Setpoint's attempt at finessing the date of either Mr. Jobe's resignation as an officer or Setpoint's termination of that status directly contravenes the supreme court's directive that non-competition agreements must be strictly construed against the party seeking their enforcement. *Swat 24*, 808 So.2d 294. That strict construction undermines any finding as to "employee" status in this case. Setpoint continues to argue in its brief that "although non-compete agreements are

to be strictly construed, strict construction does not eliminate the Court's duty to interpret the Agreement in a way that renders it effective." Setpoint references not only La.Civ.Code art. 2049 for this proposition, but two cases of this circuit as well. *See Natali v. Froeba*, 98-1354 (La.App. 3 Cir. 3/3/99), 735 So.2d 30, *writ denied*, 99-1442 (La. 9/17/99), 747 So.2d 1106; *McNeal v. Wyeth-Scott, Inc.*, 415 So.2d 568 (La.App. 3 Cir. 1982). Although both *Natali* and *McNeal* were contractual matters, neither involved a non-competition agreement. The panels in the cases merely referenced the obligation to give an agreement the effect intended by the parties. *Id.* In this case, that standard does not favor Setpoint's position as the parties clearly and definitively commemorated the date of termination and resignation as October 30, 2015, and the facts, exhibits, and testimony in the record fully support that finding.

A similar result is seen upon consideration of Setpoint's further reference to the duty to interpret a contract in a way that renders it effective. While this is correct as a concept and consistent with La.Civ.Code art. 2049, the non-competition agreement here cannot be construed as effective in contradiction to the weight of the evidence, which clearly establishes termination of employment on October 30th, as contained within the Separation Agreement itself.

Likewise, Setpoint's argument contravenes the reality of Setpoint's termination of Mr. Jobe's status as an employee and as an officer. All words, actions, and deeds—both internally and externally—show conclusively that Mr. Jobe's employment was terminated on the date of October 30, 2015, the date specifically designated by all parties as the formal date of separation contained within the Separation Agreement, the central document at issue on this point.

Furthermore, and even if Setpoint correctly identified the termination of Mr. Jobe's status as an officer as November 25, 2015, the parties specifically made that

resignation retroactive to October 30, 2015. Setpoint, a signatory to the Separation

Agreement, cannot now argue contrary to the explicit terms of the contract it drafted,

which provides:

> Effective the close of business on October 30, 2015 (the "**Termination
> Date**"), the Employee and the Company agree that the Employee's
> employment with the Company is terminated. The Employee further
> agrees that he will not hereafter seek reinstatement, recall or re-
> employment with the Company. The Employee hereby acknowledges
> and agrees that effective October 30, 2015, he has resigned from all
> positions he holds as an officer with the Company and its affiliates and
> that as of such date, he has no right, individually, to bind or act on behalf
> of the Company or any of its affiliates.

Simply, Setpoint unequivocally terminated Mr. Jobe on October 30, 2015 and

further drafted and agreed to a termination of employment and officer status as of

October 30, 2015. To now suggest that no import should be given that date not only

ignores the specific terms of the Separation Agreement, but runs contrary to the strict

construction applied to non-competition agreements. *See Swat 24*, 808 So.2d 294.

The record further establishes that, to the extent any alleged equivocation exists in

the interpretation of the Separation Agreement, it must be construed against

Setpoint, the admitted drafter of the document.[6]

While the question of whether Mr. Jobe continued to be an employee at the

time he entered into the Separation Agreement has tenets of a factual inquiry, it is

important to recall that the jury was asked only whether Setpoint proved that Mr.

Jobe "breached the non-compete agreement within 13 months after his employment

with Setpoint terminated."

---

[6] Mr. Turner testified that Setpoint's attorneys drafted the Separation Agreement. The fact is further reflected in not only the testimony of Mr. Guidry and Mr. Jobe, but also by the correspondence between the parties' counsel during the three weeks that the terms of the non-competition agreement were negotiated.

The jury was not tasked with determining the *validity* of the non-competition agreement itself.[7] That latter question was instead left to the trial court, who rejected Mr. Jobe's argument that the non-competition agreement was invalid by denying Mr. Jobe's Motion for Judgment Notwithstanding the Verdict or, in the alternative; Motion for New Trial or Remittitur.

Finding both factual and legal errors underpinning that denial, we below reverse the October 16, 2020 judgment of the trial court by which it denied Mr. Jobe's Motion for Judgment Notwithstanding the Verdict and reverse the trial court's judgment in favor of Setpoint and against Mr. Jobe awarding attorney fees plus interest from date of judgment. We, in turn, grant Mr. Jobe's motion for JNOV and enter judgment in favor of Mr. Jobe, dismissing Setpoint's claims against him with prejudice at its cost.

We note that although Mr. Jobe asserts as a secondary argument that the non-competition agreement is unenforceable as overbroad in its language, our finding above renders that argument moot. *See, e.g.*, *Ulrich v. Robinson*, 18-0534, p. 7 (La. 3/26/19), 282 So.3d 180, 186 (wherein the Louisiana Supreme Court explained that "courts will not decide abstract, hypothetical, or moot controversies, or render advisory opinions with respect to such controversies.").

---

[7] On this point, the trial court merely instructed the jury that:

> Louisiana law provides that any person may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers under specific conditions contained in the agreement. This is commonly known as a "non-compete agreement."

> In determining whether Setpoint has met its burden of proof on its *breach* of non-compete claim, you must decide whether the alleged conduct of Mr. Jobe violated the non-compete agreement.

(Emphasis added.)

*Attorney Fees and Costs*

As an extension of the finding that the non-competition agreement is unenforceable as a matter of law, we find merit in Mr. Jobe's assertion that the trial court erred in awarding attorney fees to Setpoint in the amount of $508.491.00 and taxing costs against him in the amount of $44,745.60. Those awards were made solely as an extension of the Separation Agreement, which specifically provided by Paragraph 13 for the "reimbursement" of such costs, expenses, and attorney fees in the event of a breach of the non-competition agreement contained therein.

This finding also pretermits Mr. Jobe's fifth assignment of error whereby he argues that the trial court erred in denying his motion to compel the production of the settlement agreement between Setpoint and former defendants Mr. Kiteley and Mr. Walker. Mr. Jobe's sought production of the settlement to ostensibly probe Setpoint's claim for attorney fees and costs, an award we reverse below.

*Denial of Mr. Jobe's Motion for Attorney Fees*

By his final assignment, Mr. Jobe argues that he is entitled to an award for attorney fees due to Setpoint's voluntary dismissal of the LUTSA and LUTPA claims Setpoint initially brought against him, as well as against Mr. Kiteley and Mr. Walker. Mr. Jobe maintains that the dismissal reflects Setpoint's bad faith in earlier advancing those claims against him and that fees should be awarded to him under La.R.S. 51:1434 as it relates to the LUTSA claim and La.R.S. 51:1409 as it relates to the LUTPA claim.

The statutory provisions relied upon by Mr. Jobe, however, require the trial court's determination that either the LUTSA or LUTPA claims were pursued in bad

24

faith or, with regard to the LUTPA claim, pursued for harassment purposes.[8] As Setpoint explained in opposition to Mr. Jobe's motion for attorney fees, its LUTSA and LUTPA claims were filed in conjunction with a civil conspiracy claim involving all defendants as alleged co-conspirators under LUTSA and LUTPA. Setpoint further explained that, after it entered into the settlement with Mr. Kiteley and Mr. Walker, it dismissed the corresponding statutory claims against Mr. Jobe.

Setpoint did not pursue the LUTSA and LUTPA claims against Mr. Jobe at trial, and its dismissal of those claims cannot be construed as a foundation for a bad faith finding. Instead, the evidence, even as presented at trial on the non-competition claim, revealed Mr. Jobe's participation and active interest in the development of Caliber with Mr. Kiteley and Mr. Walker, albeit after his termination. The trial court acknowledged as much in its denial of Mr. Jobe's motion for attorney fees, citing the complexity of the underlying litigation as well as the interwoven nature of the multiple allegations involved in the suit.

Following review of the entirety of the record, we find the trial court's judgment denying Mr. Jobe's motion for attorney fees and costs is fully supported by the record. Although we find that the non-competition agreement is unenforceable as a matter of law, the record is nonetheless replete with evidence of interaction between the original defendants, Mr. Kiteley and Mr. Walker, with Mr. Jobe. We therefore affirm the trial court's denial of Mr. Jobe's motion for attorney fees and costs.

---

[8] With regard to a LUTPA claim, La.R.S. 51:1409(A) provides that: "Upon a finding by the court that an action under this Section was groundless and brought in bad faith or for purposes of harassment, the court may award to the defendant reasonable attorney fees and costs."

Similarly, La.R.S. 51:1434 as it relates to a LUTSA claim provides: "If a claim of misappropriation is made in bad faith … the court may award reasonable attorney's fees to the prevailing party."

*Answer to the Appeal*

Setpoint answered the appeal, seeking additional attorney fees incurred with the defense of this appeal. As Mr. Jobe has prevailed in this matter and we below reverse the trial court's award of attorney fees and costs to Setpoint, no award to Setpoint on appeal is appropriate.

## DECREE

For the foregoing reasons, we reverse the trial court's judgment of October 16, 2020 to the extent it denied the Motion for Judgment Notwithstanding the Verdict, or, in the Alternative, Motion for New Trial or Remittitur on behalf of Defendant, Joseph Jobe. The Motion for Judgment Notwithstanding the Verdict is hereby granted, and the March 23, 2020 judgment rendered in favor of Plaintiff Setpoint Integrated Solutions, Inc. and against Defendant Joseph Jobe is reversed to the extent it cast Defendant Joseph Jobe in judgment in the amount of $137,422.05 in damages, together with legal interest thereon from date of judicial demand until paid.

The corresponding October 16, 2020 judgment rendered in favor of Plaintiff Setpoint Integrated Solutions, Inc. and against Defendant Joseph Jobe is reversed to the extent it cast Defendant Joseph Jobe in judgment for $508,491.00 in attorney fees and $44,745.61 in court costs, together with legal interest thereon from date of judgment until paid. Judgment is hereby entered in favor of Defendant Joseph Jobe, dismissing the claims of Plaintiff Setpoint Integrated Solutions, Inc. with prejudice and at its cost.

The judgment of October 16, 2020 is affirmed to the extent it denied the Motion for Attorney Fees and costs filed on behalf of Defendant Joseph Jobe.

All costs of this proceeding are assessed against Plaintiff/Appellee Setpoint Integrated Solutions, Inc.

**REVERSED IN PART; AFFIRMED IN PART AND RENDERED.**